IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOSEPH R. KARSNER, IV, | |
| Petitioner, | |
| v. | Civil Action No.:    1:07-CV-00334-RJL |
| PAMELA LOTHIAN, *et al.*, | NASD Case No.:    04-07347 |
| Respondents. | |

**PETITIONER'S OPPOSITION TO MARYLAND SECURITY COMMISSIONER'S
MOTION TO STAY PENDING APPEAL**

Petitioner Joseph R. Karsner, IV ("Petitioner" or "Karsner"), by and through his
undersigned attorneys, hereby submits this memorandum in Opposition to the
Maryland Security Commissioner's Motion for a Stay Pending Appeal.

**I.    SUMMARY OF ARGUMENT**

The Maryland Securities Commissioner (the "Maryland Commissioner"), a non-
party, fails to show that she is entitled to a stay pending appeal.  In attempting to
convince this Court that she has the requisite likelihood of success on appeal, the
Maryland Commissioner fails to address the defects in her argument for intervention.
In the absence of a right to intervene, there is no merit to any other arguments the
Maryland Commissioner may raise.

In any event, there is no merit to the Maryland Commissioner's argument that
she will succeed on appeal because this court lacked subject matter jurisdiction.  This
court had diversity jurisdiction over the matter, as alleged in Petitioner's Amended

Petition for Confirmation of Arbitration Award.  In support of her argument to the contrary, which was never previously raised, the Maryland Commissioner ignores published, persuasive authority to the contrary and instead relies solely on an unpublished, non-final minute order from a federal district court in Illinois.  The Maryland Commissioner's argument is unpersuasive and does not satisfy the standards for obtaining the extraordinary remedy of a stay pending appeal.

Moreover, the Maryland Commissioner is not entitled to a stay pending appeal, as there is no threat of irreparable harm to her and the public interest would not adversely impacted if the stay is denied.  Finally, a stay pending appeal is inappropriate as Karsner would be harmed if the stay were granted.  Thus, this Court should deny the Maryland Commissioner's Motion for a Stay Pending Appeal (the "Motion to Stay").

## II.     PROCEDURAL BACKGROUND

Petitioner and Respondent Pamela Lothian ("Lothian") were involved in a private arbitration before the National Association of Securities Dealers ("NASD") in the District of Columbia.  In the arbitration, Lothian sought compensatory damages in the amount of $104,638.00, plus punitive damages, fees, and costs.  *See* Stipulated Award at 1-2, a copy of which is attached hereto as **Exhibit 1**.  The Petitioner and Lothian were able to settle their dispute and the parties submitted a Stipulated Award to the arbitration panel overseeing that matter.

The Stipulated Award included an expungement provision.  The arbitration panel reviewed the relevant documentary evidence, found that the claims were clearly erroneous, and approved the Stipulated Award (the "Arbitration Award").  Thereafter,

Karsner filed his Petition to Confirm Arbitration Award (the "Petition") with this Court. Respondent NASD filed a response stating that it did not oppose the confirmation of the Arbitration Award. Respondent Lothian, who consented to the expungement award, did not file any response.

After the deadline for responding to the Petition passed with no opposition being noted by either Lothian or the NASD, the Maryland Commissioner filed a motion seeking to intervene for the purpose of opposing confirmation of the Arbitration Award. Petitioner argued that the motion to intervene was due to be denied as it was barred by the statute of limitations and it failed to assert any recognized ground for judicial review of an arbitration award. Ultimately, this Court denied the motion to intervene and granted the petition to confirm the arbitration award. Thereafter, the Maryland Commissioner filed her appeal.

## III.    ARGUMENT

### A.    Standard Of Determination.

A stay pending appeal is "an extraordinary remedy" that requires "careful deliberation" and should be granted only if the movant "persuade[s] the Court of the necessity of the relief." *Humane Society v. Johanns*, Civ. No. 06-265, 2007 WL 1120404, at *5 (D.D.C. April 13, 2007) (internal citations omitted).[1]  Four factors are considered in determining whether this extraordinary remedy is warranted: "(1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others

---

[1]        A copy of this decision is attached hereto as **Exhibit 2**.

will be harmed if the court grants the stay; and (4) the public interest in granting the stay." *Id*.

The United States Court of Appeals for the District of Columbia Circuit has reiterated that the moving party "must satisfy 'stringent standards required for a stay pending appeal'" *Id*. (quoting *Judicial Watch, Inc. v. National Energy Policy Dev. Group*, 230 F. Supp. 2d 12, 14 (D.D.C. 2002)). "Where a moving party fails to establish a substantial case on the merits, and further fails to 'demonstrate that the balance of equities or the public interest strongly favor the granting of a stay,' a motion for stay is property denied." *Humane Soc'y*, 2007 WL 1120404, at *5 (quoting *Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 978 (D.C. Cir. 1985)).

**B.    The Maryland Commissioner Has No Likelihood Of Success On Appeal**.

In attempting to demonstrate a substantial likelihood of success on the merits of her appeal, the Maryland Commissioner focuses only on an asserted lack of subject matter jurisdiction.  Her argument is flawed for two reasons.

First, the Maryland Commissioner has ignored the fact that she is a non-party to this case.  She does not argue that she has any likelihood of success on the denial of her motion to intervene.  Her failure to address that argument is indicative of the likelihood that she will <u>not</u> succeed on this point on appeal.

The Maryland Commissioner's Motion to Intervene was properly denied as futile, because her proposed opposition to the Petition for Confirmation was barred by

the statute of limitations[2] and it failed to set forth an accepted ground for judicial review of an arbitration decision.[3]  *See, e.g., Kifafi v. Hilton Hotel Retirement Plan*, Civ. No. 98-1517, 2004 U.S. Dist. LEXIS 28928, at *24 (D.D.C. Sept. 27, 2004) (denying motion to intervene where purpose of intervention could not be achieved).[4]  The failure of the Maryland Commissioner's attempt to intervene is fatal to her arguments concerning her likelihood of success on appeal--as she has no right to intervene, she cannot succeed on any other claim she may seek to advance concerning the merits of the confirmation.

In any event, there is no merit to the Maryland Commissioner's argument that this Court lacked subject matter jurisdiction.  This case was properly within this Court's diversity jurisdiction, 28 U.S.C. § 1332, as alleged in the Amended Petition for Confirmation.  There is complete diversity between the Petitioner and the Respondents: Mr. Karsner is a resident of North Carolina; Respondent Pamela Lothian is a resident of Virginia; and, the NASD is a Delaware corporation that has its principal places of business in Maryland and the District of Columbia.  The amount in controversy is the amount sought in the arbitration, in excess of $104,638, which exceeds the jurisdictional amount.  *See American Guaranty Co. v. Caldwell*, 72 F.2d 209 (9th Cir. 1934) (holding that diversity jurisdiction existed over petition seeking to vacate $0 arbitration award; noting that there had been evidence in the arbitration that the claimant suffered damages in excess of $100,000 and explaining that it was the amount in controversy in

---

[2]       *See* 28 U.S.C. § 12 (establishing three month statute of limitations for a motion to vacate, modify, or correct an arbitration award).
[3]       *See Sapiro v. Verisign*, 310 F. Supp. 2d 208, 215 (D.D.C. 2004) (noting the limited bases for judicial review of an arbitration award).
[4]       A copy of this decision is attached hereto as **Exhibit 3**.

the underlying arbitration, not the amount of the arbitration award, that must be considered in determining if diversity jurisdiction exists); *North Am. Thought Combine, Inc. v. Kelly*, 249 F. Supp. 2d 283 (S.D.N.Y. 2003) (explaining that where the defendant prevailed in the arbitration and then seeks to confirm the award, the court "should look to the value of the relief requested in the arbitration complaint" to determine if diversity jurisdiction exists); *Doctor's Assocs., Inc. v. Stuart*, 11 F. Supp. 2d 221 (D. Conn. 1998) (holding that it had diversity jurisdiction over petition to confirm arbitration award that awarded no damages; explaining that "[t]he amount in controversy is the difference 'between winning and losing the underlying arbitration'" and observing that the underlying arbitration sought $1.5 million in compensatory damages and $5 million in punitive damages).  The Maryland Commissioner's reliance on a non-final,[5] unpublished, minute order from Illinois federal court, on an issue that was not fully briefed by the parties to that proceeding,[6] is of dubious merit, at best.

### C.    The Maryland Commissioner Will Not Be Irreparably Harmed And The Public Interest Is Adequately Protected.

The Maryland Commissioner again argues, as she did in her Proposed Opposition to the confirmation, that the expungement would somehow interfere with her responsibilities.  *See* Mot. to Stay at 5.  There is no merit to the Maryland Commissioner's suggestion.  Expungement of CRD records simply is not contrary to public policy.  As the Maryland Commissioner recognized in her own filings,

---

[5]    The petitioner in that case filed a Motion for Reconsideration which is presently pending.  A copy of that motion is attached hereto as **Exhibit 4**.

[6]    *See* Ex. 4 at 2.

expungement serves to "protect the professional from the specter of a wrongful allegation." *See* Maryland Commissioner's Mem. in Support of Opp'n to Confirmation of Arbitration Award, at 5.  Thus, expungement is not contrary to any explicit or dominant public policy.  This is especially true in the case at bar, as the arbitration panel reviewed documents relevant to Lothian's claims and affirmatively determined that the claims were clearly erroneous.

Moreover, expungement of the CRD Records could in no way interfere with the Maryland Commissioner's duties.  The Maryland Commissioner is obviously aware of the information in those records and expungement of the records will not impede her ability to develop facts related to purported wrongful conduct by Petitioner.  Further, to the extent the citizens of Maryland have an interest in the qualifications of Karsner, that interest is fully protected by the administrative action instituted against Karsner by the Maryland Commissioner.  Thus, there is absolutely no merit to the Maryland Commissioner's vague assertion that the public interest and her ability to fulfill her statutory responsibilities will somehow be impeded by the expungement of the CRD Records.

**D.     The Petitioner Will Be Harmed If The Stay Is Granted.**

As noted above, the NASD arbitration panel reviewed documents relevant to Lothian's claims against Karsner and affirmatively determined that the claims were clearly erroneous.  The Maryland Commissioner has recognized that expungement is necessary to "protect the professional from the specter of a wrongful allegation." *See* Maryland Commissioner's Mem. in Support of Opp'n to Confirmation of Arbitration

Award, at 5.  It is disingenuous for her to now argue that Karsner will not be harmed by the continued maintenance on his record of information related to such clearly erroneous claims.

**IV.    CONCLUSION**

The Motion for a Stay Pending Appeal should be denied as the Maryland Commissioner has failed to meet the stringent standards for this extraordinary remedy.

Respectfully submitted,


_____/s/_____
Richard J. Magid
Whiteford, Taylor & Preston
7 Saint Paul Street
Baltimore, Maryland 21202

and

George S. Mahaffey, Jr.
Goodell, DeVries, Leech & Dann, LLP
One South Street, 20th Floor
Baltimore, Maryland 21202

*Attorneys for Petitioner,*
*Joseph R. Karsner, IV*

1737297

## Stipulated Award
### NASD Dispute Resolution

In the Matter of the Arbitration Between:

| | |
|---|---|
| Name of the Claimant<br>Pamela Lothian | Case Number: 04-07347 |

| | |
|---|---|
| Names of the Respondents<br>Legacy Financial Services, Inc.<br>Joseph Karsner | Hearing Site: Washington, D.C. |

Nature of the Dispute:   Customer vs. Member and Associated Person.

### REPRESENTATION OF PARTIES

Claimant, Pamela Lothian, "Claimant", was represented by William B. Young, Jr., Esq., Hooper & Weiss, L.L.C., Orlando, Florida.

Respondents, Legacy Financial Services, Inc. ("Legacy Financial") and Joseph Karsner ("Karsner"), hereinafter collectively referred to as "Respondents", were represented by Jeffrey J. Hines, Esq., and George S. Mahaffey, Jr., Esq., Goodell, DeVries, Leech & Dann, LLP, Baltimore, Maryland.

### CASE INFORMATION

Statement of Claim filed on October 19, 2004.
Claimant signed the Uniform Submission Agreement on August 24, 2004.
Statement of Answer filed by Respondents on December 13, 2004.
Motion to Dismiss filed by Respondents on February 21, 2005.
Claimant filed a Response to the Motion to Dismiss on March 1, 2005.

### CASE SUMMARY

Claimant in her Statement of Claim asserted the following cause of action: unsuitability. The cause of action relates to the purchase of shares in American Skandia and John Hancock mutual funds.

Unless specifically admitted in its their Answer, Respondents denied the allegations made in the Statement of Claim and asserted various defenses.

### RELIEF REQUESTED

Claimant in her Statement of Claim and Amended Statement of Claim requested:
    Compensatory Damages                   $104,638.00

NASD Dispute Resolution
Arbitration No. 04-07347
Award   Page 2

| | |
|---|---|
| Punitive Damages | amount unspecified |
| Interest | amount unspecified |
| Attorneys' Fees | amount unspecified |
| Other Costs | amount unspecified |

Respondents in their Statement of Answer and Motion to Dismiss requested that Claimant's Statement of Claim be dismissed in its entirety and that the Arbitration Panel (the "Panel") award the Respondents' forum fees, attorneys' fees and any other costs and fees incurred by Respondents in defending this action.

## OTHER ISSUES CONSIDERED AND DECIDED

Respondents did not file with NASD Dispute Resolution properly executed submissions to arbitration but are required to submit to arbitration pursuant to the Code and, having answered the claim, are bound by the determination of the Panel on all issues submitted.

By Order dated April 22, 2005 the Panel denied Respondents' Motion to Dismiss.

On or about December 5 2005 the parties entered into an agreement to settle this matter on certain terms and conditions set forth in a confidential settlement agreement.

The parties agreed that the Respondents are not liable for the counts listed in the Statement of Claim and Amended Statement of Claim, that the investments at issue were suitable, and that the Stipulated Award for this matter may be executed in counterpart copies.

## AWARD

The parties entered into an agreement to present to the Panel a Stipulated Award. Upon motion of all parties for a Stipulated Award and Claimant's agreement, as a result of information and documents received during the discovery process, that all investments at issue were suitable and that the Respondents are not liable for any of the counts in the Statement of Claim and Amended Statement of Claim; the Panel finds that the claims, allegations and information contained in the Statement of Claim and Amended Statement of Claim are clearly erroneous and that the Respondents were not involved in the alleged investment-related sales practice violations. The Panel hereby grants the parties' motion and enters this award granting the following relief:

1. Pursuant to the confidential settlement agreement reached between all parties, all claims against Respondents are dismissed with prejudice;

2. The Panel recommends the expungement of all reference to the above-captioned arbitration from Respondent Karsner's registration record maintained by the NASD Central Registration Depository ("CRD"), with the understanding that, pursuant to NASD Notice to Members 04-16, Respondent Karsner must obtain confirmation from a court of competent jurisdiction before the CRD will execute the expungement directive. Unless specifically waived in writing by the NASD, parties seeking judicial confirmation of an

NASD Dispute Resolution
Arbitration No. 04-07347
Award   Page 3

arbitration award containing expungment relief must name NASD as an additional party and serve NASD with all appropriate documents.

Pursuant to Rule 130, the Panel has made the following affirmative findings of fact: the claim, allegation or information is clearly erroneous and the registered person was not involved in the alleged investment-related sales practice violation;

3.  The parties shall bear their own costs, including attorneys' fees, except as fees are specifically addressed below; and

4.  Any and all relief not specifically addressed herein, including punitive damages, is denied in its entirety.

## FEES

Pursuant to the Code, the following fees are assessed:

Filing Fees
NASD Dispute Resolution will retain or collect the non-refundable filing fees for each claim:
| | |
|---|---|
| Initial claim filing fee | = $ 300.00 |

Member Fees
Member fees are assessed to each member firm that is a party in these proceedings or to the member firms that employed the associated person(s) at the time of the events giving rise to the dispute.  Accordingly, Respondent Legacy Financial is a party.

| | |
|---|---|
| Member surcharge | = $1,700.00 |
| Pre-hearing process fee | = $  750.00 |
| Hearing process fee | = $2,750.00 |
| Total Member Fees | = $5,200.00 |

Forum Fees and Assessments
The Panel has assessed forum fees for each session conducted.  A session is any meeting between the parties and the arbitrator(s), including a pre-hearing conference with the arbitrator(s), that lasts four (4) hours or less.  Fees associated with these proceedings are:

| | | | |
|---|---|---|---|
| Two (2) Pre-hearing sessions with Panel @ $1,125.00 | | | = $2,250.00 |
| Pre-hearing conferences: | March 14, 2005 | 1 session | |
| | April 22, 2005 | 1 session | |
| Total Forum Fees | | | = $2,250.00 |

1. The Panel has assessed $750.00 of the forum fees to Claimant
2. The Panel has assessed $750.00 of the forum fees to Respondent Legacy Financial.
3. The Panel has assessed $750.00 of the forum fees to Respondent Karsner.

02/14/2006 16:55 FAX  202 728 0082        NASD DISPUTE RESOLUTION            ☑007/014

NASD Dispute Resolution
Arbitration No. 04-07347
Award   Page 4

## FEE SUMMARY

1. Claimant is assessed and shall pay the following fees:
   Initial Filing Fee                              = $   300.00
   Forum Fees                                      = $   750.00
   Retained Hearing Session Deposit                = $   375.00
   Total Fees                                      = $1,425.00
   Less payments                                   = $1,425.00
   Balance Due NASD Dispute Resolution             = $    00.00

2. Respondent Legacy Financial is assessed and shall pay the following fees:
   Member Fees                                     = $5,200.00
   Forum Fees                                      = $  750.00
   Total Fees                                      = $5,950.00
   Less payments                                   = $5,200.00
   Balance Due NASD Dispute Resolution             = $  750.00

3. Respondent Karsner is assessed and shall pay the following fees:
   Forum Fees                                      = $  750.00
   Total Fees                                      = $  750.00
   Less payments                                   = $   00.00
   Balance Due NASD Dispute Resolution             = $  750.00

All balances are payable to NASD Dispute Resolution and are due upon receipt pursuant to Rule
10330(g) of the Code.

## ARBITRATION PANEL

Robert O. Harris, Esq.           -        Public Arbitrator, Presiding Chairperson
Stanley H. Ragle, Esq.           -        Public Arbitrator, Panelist
Wendie L. Wachtel                -        Non-Public Arbitrator, Panelist

NASD Dispute Resolution
Arbitration No. 04-07347
Award   Page 5

Concurring Arbitrator' Signatures

*Robert O. Harris*                                    2/13/06
Robert O. Harris, Esq.                                Signature Date
Public Arbitrator, Presiding Chairperson


Stanley H. Ragle, Esq                                 Signature Date
Public Arbitrator, Panelist


Wendie L. Wachtel                                     Signature Date
Non-Public Arbitrator, Panelist

2/14/06

Date of Service  (For NASD Dispute Resolution office use only)

02/14/2006 16:56 FAX  202 728 8082          NASD DISPUTE RESOLUTION                    ☑009/014

NASD Dispute Resolution
Arbitration No. 04-07347
Award   Page 5

<u>Concurring Arbitrators' Signatures</u>

_____                    _____
Robert O. Harris, Esq.                       Signature Date
Public Arbitrator, Presiding Chairperson


_____                    _____
Stanley H. Ragle, Esq                        Signature Date
Public Arbitrator, Panelist                  2/19/06


_____                    _____
Wendie L. Wachtel                            Signature Date
Non-Public Arbitrator, Panelist


_____
Date of Service (For NASD Dispute Resolution office use only)

02/14/2006 16:56 FAX  202 728 8082          NASD DISPUTE RESOLUTION                    ☑010/014

DEC-12-'13 FRI 19:43 ID:          FAX NO:                    #489 P02
02/08/2006 17:57 FAX  202 728 8082      NASD DISPUTE RESOLUTION            ☑007/007

NASD Dispute Resolution
Arbitration No 04-07347
Award Page

Concurring Arbitrator Signatures


_____
Robert O. Harris, Esq.                          _____
Public Arbitrator, Presiding Chairperson            Signature Date


_____
Stanley H. Rug n, Esq                            _____
Public Arbitrator, Panelist                          Signature Date


*[signature]*
_____                  *2/10/06*
Wendie L. Wachtel                                _____
Non-Public Arbitrator, Panelist                      Signature Date


_____
Date of Service ( For NASD Dispute Resolution office use only)

Only the Westlaw citation is currently available.

United States District Court,
District of Columbia.
The HUMANE SOCIETY OF the UNITED STATES, et al., Plaintiffs,
v.
Mike JOHANNS, et al., Defendants.
Civil Action No. 06-265 (CKK).
April 13, 2007.

Eric Robert Glitzenstein, Howard M. Crystal, Meyer Glitzenstein & Crystal, Ethan Carson Eddy, The Humane Society of the United States, Washington, DC, for Plaintiffs.
Beverly Maria Russell, U.S. Attorney's Office for D.C., Washington, DC, for Defendants.

### *MEMORANDUM OPINION*

COLLEEN KOLLAR-KOTELLY, United States District Judge.

*\*1* In Claim Three of Plaintiffs' Amended Complaint, Plaintiffs had alleged that, "by creating a fee-for-service ante-mortem horse slaughter inspection system without first conducting any environmental review under the National Environmental Policy Act [ (NEPA) ], 42 U.S.C. § 4321, *et seq.,* [United States Department of Agriculture (USDA) ] has violated NEPA and the [Council on Environmental Quality's (CEQ's) ] implementing regulations, abused its discretion, and acted arbitrarily and capriciously in violation of the Administrative Procedure Act [ (APA) ], 5 U.S.C. § 706(2)." Am. Compl. ¶ 98. On March 28, 2007, the Court issued an [67] Order and accompanying [68] Memorandum Opinion with respect to Claim Three, granting [39] Plaintiffs' Motion for Summary Judgment, denying [37] Defendants' Motion to Dismiss, or Alternatively, for Summary Judgment, and denying [38, 40] Defendant-Intervenors' Motion to Dismiss or, in the Alternative, for Summary Judgment on Claim Three of Plaintiffs' First Amended Complaint. In its Order, the Court declared the Interim Final Rule at issue to be in violation of the APA and NEPA, vacated the Interim Final Rule, permanently enjoined the Food Safety and Inspection Service (FSIS) from implementing the Interim Final Rule, and dismissed this case in its entirety.

Presently before the Court is Defendant-Intervenor Cavel International, Inc's [69] Emergency Motion for a Stay of the Court's March 28, 2007 Order. On April 3, 2007, the Federal Defendants indicated that while they "support[ed]" Cavel's motion, they would "not file a brief as the Federal Defendants' previous filings comprehensively present the Federal Defendants' position." *See dkt. entry* April 3, 2007. On April 6, 2007, Plaintiffs filed an Opposition. Defendant-Intervenor Cavel (hereinafter, "Cavel") indicated that it will not file a Reply. *See dkt. entry* [71] at 1. Based on a review of the Parties' filings, the relevant statutes and case law, and the history of the case (including the Court's prior orders and memorandum opinions in this case), the Court shall DENY [69] Defendant-Intervenor Cavel's Emergency Motion for a Stay of the Court's March 28, 2007 Order.

### I: BACKGROUND

#### *A. Factual History* <sup>FN1</sup>

FN1. The Court shall repeat the factual predicate and procedural history, to the extent applicable, as set out in its March 28, 2007 Memorandum Opinion. *See* [68] Mem. Op. at 3-7.

At the time Plaintiffs filed their Complaint, horses were slaughtered at three different foreign-owned facilities in the United States to provide horse meat for human consumption abroad and for use in zoos and research facilities domestically. The instant case pertains to the web of legislation and regulations pertaining to the inspection of such horses prior to slaughter. The Court notes that as of the Court's March 28, 2007 Order and Memorandum Opinion, Cavel was the only facility still in operation processing horsemeat for human consumption, see Cavel's Mem. to Stay Order at 2-3, as a recent ruling of the United States Court of Appeals for the Fifth Circuit held that the other two Intervenors could be prosecuted for violating a Texas law that "on its face prohibits the processing, sale or transfer of horsemeat for human consumption." *Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry, 476 F.3d 326, 329 (5th Cir.2007).*

*\*2* On November 10, 2005, Section 794 of the FY 2006 Agricultural Appropriations Act was signed into law. Introduced by members of Congress as an amendment to the FY 2006 Agricultural Appropriations Act, the Amendment provides:

Effective 120 days after the date of enactment of this Act, none of the funds made available in this Act may be used to pay the salaries or expenses of personnel to inspect horses under section 3 of the Federal Meat Inspection Act (21 U.S.C. Sec. 603) or under the guidelines issued under section 903 of the Federal Agriculture Improvement and Reform Act of 1996.

*See* Pub.L. 109-97, § 794, 119 Stat. 2120, 2164 (A.R.51). The provision of the Federal Meat Inspection Act ("FMIA"), 21 U.S.C. § 603, pertaining to the inspection of horses provides: "For the purpose of preventing the use in commerce of meat and meat food products which are adulterated, the Secretary shall cause to be made, by inspectors appointed for that purpose, an examination and inspection of all amenable species [including cattle, sheep, swine, goats, horses, mules, and other equines] before they shall be allowed to enter into any slaughtering, packing, meat-canning, rendering, or similar establishment, in which they are to be slaughtered and the meat and meat food products thereof are to be used in commerce...." 21 U.S.C. § 603(a). *See also* 21 U.S.C. § 601(w)(1). The provision of section 903 of the Federal Agriculture Improvement and Reform (FAIR) Act of 1996 pertaining to the inspection of horses relates to inspections during the transport of horses, which is not at issue in the instant case. Plaintiffs understand the FY 2006 Amendment to in effect prohibit the slaughter of horses for human consumption. Pls.' Mot. for Prelim. Inj. at 10.

On November 23, 2005, Beltex Corporation, Dallas Crown, Inc., and Cavel (collectively the "Slaughter Facility Operators") filed a petition for "emergency rulemaking" with the USDA to create a "fee-for-service" inspection program with respect to ante-mortem horse inspections and transportation-related horse inspections. Pls .' Mot. for Prelim. Inj., Ex. 10 (Petition) at 1. On February 8, 2006, FSIS published in the Federal Register an amendment to 9 C.F.R. Pt. 352, "amending the Federal meat inspection regulations to provide for a voluntary fee-for-service program under which official establishments that slaughter horses will be able to apply for and pay for ante-mortem inspection." 71 Fed.Reg. 6337, 6337 (Feb. 8, 2006). The "interim final rule" was given an effective date of March 10, 2006; additionally, FSIS provided a shortened comment period "because it is issuing an interim final rule and finds that it is in the public interest for [FSIS] to receive comments on an expedited basis" before March 10, 2006, the date on which the 2006 Amendment to the Agricultural Appropriations Act would take effect. *Id.* at 6337, 6340. Elaborating on the need for immediate action, FSIS states:

*\*3* [w]ith the passage of the FY 2006 Appropriations Act, if FSIS does not establish a means for official establishments that slaughter horses to obtain anti-mortem inspection, these establishments will not be able to operate and presumably will be forced out of business. This interim final rule is necessary to avoid disruption of operations at official

establishments that slaughter horses. Therefore, the Administrator has determined that prior notice and opportunity for public comment are impracticable and contrary to the public interest under 5 U.S.C. 553(b), and that there is good cause under 5 U.S.C. 553(d) for making the action effective as specified herein.

*Id.* at 6340. FSIS further specified that it is "establishing this fee-for-service program under the Agricultural Marketing Act (AMA)." *Id.* at 6337.

### B. Procedural History

In Plaintiffs' [3] First Amended Complaint, filed on February 21, 2006, Plaintiffs made three claims for relief. First, Plaintiffs claimed that the fee-for-service inspection system was created in violation of the APA, 5 U.S.C. § 553, because advance public notice and opportunity to comment was not provided. Am. Compl. ¶¶ 94, 95. Second, Plaintiffs claimed that Defendants violated the APA, 5 U.S.C. § 706, principally by acting arbitrarily and capriciously in violation of both the 2006 Agricultural Appropriations Act Amendment and the FMIA. Am. Compl. ¶¶ 96, 97. Finally, Plaintiffs claimed that Defendants violated NEPA and its implementing regulations by acting arbitrarily and capriciously in violation of the APA, 5 U.S.C. § 706. Am. Compl. ¶¶ 98, 99.

Shortly after filing their First Amended Complaint, Plaintiffs filed [4] Plaintiffs' Motion for a Temporary Restraining Order and for a Preliminary Injunction, and Request for a Hearing ("Motion for Preliminary Injunction") on February 22, 2006. In their Motion, Plaintiffs reiterated the grounds for relief stated in their First Amended Complaint and furthermore requested that the Court preliminarily enjoin and declare unlawful the fee-for-service ante-mortem inspection program that would become effective on March 10, 2006 on the grounds that Plaintiffs had demonstrated likelihood of success on the merits, irreparable harm, lack of harm to Defendants, and public interest factors necessary to obtain injunctive relief. Pls.' Mot. for Prelim. Inj. at 1-2. On February 24, 2006, Beltex Corporation, Cavel, and Dallas Crown, Inc. filed an unopposed [7] Motion to Intervene as of right as Defendants, which was granted by the Court on March 1, 2006. On March 14, 2006, the Court issued an [21] Order and [22] Memorandum Opinion denying Plaintiffs' request for a preliminary injunction and dismissing Claims One and Two of Plaintiffs' Amended Complaint. The Court also noted that unclear briefing and incomplete documentation by both sides with respect to Plaintiffs' NEPA claim precluded the Court from making a determination on the merits based on the record before it.

*\*4* Following the Court's March 14, 2006 ruling, the Parties submitted Motions for Summary Judgment with respect to Claim Three of the Amended Complaint. On May 1, 2006, Defendants filed [37] Defendants' Motion to Dismiss, or Alternatively, for Summary Judgment; Defendant-Intervenors filed [38, 40] Defendant-Intervenors' Motion to Dismiss or, in the Alternative, for Summary Judgment on Claim Three of Plaintiffs' First Amended Complaint; and Plaintiffs filed [39] Plaintiffs' Motion for Summary Judgment.

On March 24, 2006, Plaintiffs also filed [23] Plaintiffs' Motion Under Fed.R.Civ.P. 54(b) for Reconsideration of the Court's *Sua Sponte* Dismissal of Claims One and Two or, In the Alternative, for Certification of Those Claims for Immediate Appellate Review, and Request for an Expedited Hearing. Therein, Plaintiffs asked the Court to reconsider its dismissal of Claims One and Two, which had been made on the Court's finding that Plaintiffs lacked prudential standing to pursue the claims set forth in these two claims. Pls.' Mot. Reconsider at 1. Plaintiffs further requested that in the alternative, the Court certify Claims One and Two for immediate appellate review. *Id.* Finally, Plaintiffs requested a hearing related to their Motion to Reconsider. *Id.*

On August 28, 2006, the Court issued an [53] Order and [54] Memorandum Opinion

granting Plaintiffs' [23] Motion to Reconsider with respect to the Court's dismissal of Claim One of the Amended Complaint, but denying Plaintiffs' Motion with respect to Claim Two of the Amended Complaint. Furthermore, the Court denied Plaintiffs' request for certification for immediate appellate review with respect to Claim Two and denied Plaintiffs' request for a hearing as unnecessary and counter to the interests of judicial economy. The Court also provided a briefing schedule with respect to Claim One, and indicated that the Court would address Plaintiffs' NEPA claim (Claim Three) at the same time it addressed briefing with respect to Claim One. Following the Court's August 28, 2006 ruling, the Parties (Plaintiffs, Defendants, and Defendant-Intervenors) submitted Motions for Summary Judgment with respect to Claim One.

Finally, on March 28, 2007, the Court issued an [67] Order and an accompanying 49-page [68] Memorandum Opinion with respect to Claim Three, granting [39] Plaintiffs' Motion for Summary Judgment; denying [37] Defendants' Motion to Dismiss, or Alternatively, for Summary Judgment; and denying [38, 40] Defendant-Intervenors' Motion to Dismiss or, in the Alternative, for Summary Judgment on Claim Three of Plaintiffs' First Amended Complaint. Based on the Court's finding of a NEPA violation, the Court declared the Interim Final Rule to be in violation of the APA and NEPA, vacated the Interim Final Rule, permanently enjoined the FSIS from implementing the Interim Final Rule, and dismissed this case. (The Court also determined that it need not reach the issue of whether the Notice and Comment provisions of the APA were violated in the promulgation of the Interim Final Rule at issue, accordingly denying as moot [55] Plaintiffs' Motion for Summary Judgment on Claim One; [58] Defendant-Intervenors' Cross-Motion for Summary Judgment on Claim One of Plaintiffs' First Amended Complaint; and Defendants' [60] Motion for Summary Judgment on Claim One and Defendants' Motion to Dismiss, or Alternatively for Summary Judgment on this Claim.)

*5 On April 2, 2007, Cavel, which operates in DeKalb, Illinois, filed an [69] Emergency Motion for a Stay of the Court's March 28, 2007 Order. The Court notes that the other two Intervenors-Beltex Corporation and Dallas Crown, Inc.-did not join Cavel in filing its Emergency Motion. On April 3, 2007, the Federal Defendants indicated that while they "support[ed]" Cavel's motion, they would "not file a brief as the Federal Defendants' previous filings comprehensively present the Federal Defendants' position." *See dkt. entry* April 3, 2007. On April 6, 2007, Plaintiffs filed an Opposition. Cavel indicated that it will not file a Reply. *See dkt. entry* [71] at 1. Accordingly, Cavel's motion is now ripe for adjudication.

## II: LEGAL STANDARD

The following factors are to be considered when determining whether a stay pending appeal is warranted:

(1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay. To justify the granting of a stay, a movant need not always establish a high probability of success on the merits. Probability of success is inversely proportional to the degree of irreparable injury evidenced. A stay may be granted with either a high probability of success and some injury, or *vice versa.*

*Cuomo v. U.S. Nuclear Regulatory Comm'n,* 772 F.2d 972, 974 (D.C.Cir.1985) (internal citation omitted); *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 843 (D.C.Cir.1977); *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n,* 259 F.2d 921, 925 (D.C.Cir.1958).

Importantly, it is "the movant's obligation to justify the court's exercise of such an extraordinary remedy." *Cuomo,* 772 F.2d at 978; *see also Twelve John Does v. District of Columbia,* Civ. No. 80-2136, 1988 WL 90106 at *1 (D.D.C. Aug. 4, 1988) ("An indefinite stay pending appeal is an extraordinary remedy, and is to be granted only after careful deliberation has persuaded the Court of the necessity of the relief.") (citing *Va. Petroleum Jobbers,* 259 F.2d at 925). "This Circuit has recently reiterated that a moving party must satisfy 'stringent standards required for a stay pending appeal.' " *Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Group,* 230 F.Supp.2d 12, 14 (D.D.C.2002) (quoting *Summers v. Howard Univ.,* Civ. No. 02-7069, 2002 WL 31269623 (D.C .Cir. Oct. 10, 2002)). Where a moving party fails to establish a substantial case on the merits, and further fails to "demonstrate that the balance of equities or the public interest strongly favor the granting of a stay," a motion for stay is properly denied. *Cuomo,* 772 F.2d at 978. In the instant case, Cavel has not satisfied the "stringent standards required for a stay pending appeal," as the Court will discuss below.

## III. DISCUSSION

### A. Cavel has not demonstrated a likelihood of success on the merits

*\*6* "The first, and most important, hurdle which the petitione[r for a stay] must overcome is the requirement that [it] present a strong likelihood of prevailing on the merits of [its] appeal." *Am. Cetacean Soc'y v. Baldrige,* 604 F.Supp. 1411, 1414 (D.D.C.1985). *See also Shays v. FEC,* 340 F.Supp.2d 39, 45 (D.D.C.2004), *aff'd,* 414 F.3d 76 (D.C.Cir.2005). "Without such a substantial indication of probable success, there would be no justification for the Court's intrusion into the ordinary processes of administration and judicial review." *Va. Petroleum Jobbers,* 259 F.2d at 925. "Even should the petitioner show irreparable harm would result without the imposition of [a] stay, if the requirement of a strong likelihood of success is not met, the petition will be denied." *Am. Cetacean Soc'y,* 604 F.Supp. at 1414 (citing *Blankenship v. Boyle,* 447 F.2d 1280 (D.C.Cir.1971)). This does not mean that the applicant's chances of success on appeal must appear as a "mathematical probability," but that the trial court, in the exercise of its discretion, must weigh the probability of success on appeal in a "balance of equities" with the three other factors. *Holiday Tours,* 559 F.2d at 844.

Cavel argues that it has a substantial likelihood of prevailing on the merits of its appeal based on three grounds, which the Court will address in turn: FN2

FN2. Cavel also states that the Court's ruling "essentially imposes new and additional documentation preconditions upon USDA's categorical exclusions...." Cavel's Mem. to Stay Order at 15. However, in its Memorandum Opinion, the Court explicitly stated that "[i]t need not reach the issue of precisely what process is required of FSIS." [68] Mem. Op. at 40.

(1) Cavel argues that the Court "failed to give 'controlling weight' to FSIS's interpretation of its own categorical exclusion regulations and appropriate deference to FSIS's determination of no 'extraordinary circumstances [.]' " Cavel's Mem. to Stay Order at 16-19. However, the Court dealt at length with this argument in the Court's [68] Memorandum Opinion, and hereby incorporates its reasoning therein as set forth below:

An agency cannot invoke a categorical exclusion for the first time in legal briefings when no such invocation exists in the record. *See Fund for Animals, Inc. v. Espy,* 814 F.Supp. 142 (D.D.C.1993) ("Dispositive here, however, is the virtual admission of counsel for the defendant that neither defendant nor any authorized subordinate made any

contemporaneous determination as to whether the study falls within or without a categorical exclusion under 7 C.F.R. § 1b.3, or that either an EIS or an EA (one or the other of which is required in the absence of a categorical exclusion) should be prepared. Invocation of the categorical exclusion for the first time by counsel after the complaint was filed in this case appears to be a *post hoc* rationalization, and is inadequate as a basis for review."). "Although the Court of Appeals has not addressed this particular issue, both judges of this Court that have considered the issue have found that a post hoc invocation of a categorical exclusion during litigation cannot justify a failure to prepare an EA or EIS. *See Anacostia Watershed Soc'y v. Babbitt,* 871 F.Supp. 475, 481 (D.D.C.1994); *Fund for Animals v. Espy,* 814 F.Supp. 142, 149-51 (D.D.C.1993)." *Edmonds Inst. v. Babbitt,* 42 F.Supp.2d 1, 18 (D.D.C.1999). While Defendants in this case relied in their legal filings on the categorical exclusion of FSIS as an agency as set forth in 7 C.F.R. § 1b.4, rather than the action-based categorical exclusions set forth in 7 C.F.R. § 1b.3, Defendants have pointed to no case law suggesting that FSIS is exempted from contemporaneously invoking its categorical exclusion with respect to each action it undertakes in light of the "extraordinary circumstances" caveat in 7 C.F.R. § 1b .4 itself. *See* Pls.' Mem. for Summ. J. at 34. However, the Court need not reach the issue of precisely what process is required of FSIS pursuant to 7 C.F.R. § 1b.4. *Cf. California v. Norton,* 311 F.3d 1162, 1176 (9th Cir.2002) ("In many instances, a brief statement that a categorical exclusion is being invoked will suffice ."). What is clear is that in this case, Defendants' failure to give any consideration as to whether or not the Interim Final Rule invoked "extraordinary circumstances" such that it "may have a significant environmental effect," violated 7 C.F.R. § 1b.4 and NEPA's implementing regulations. Concretely, 7 C.F.R. § 1b.4 does not permit FSIS to avoid any consideration of whether extraordinary circumstances apply, and Defendants' interpretation to this effect is arbitrary and capricious.

*\*7* Pursuant to USDA regulations, "[a]ctions of [the FSIS] are categorically excluded from the preparation of an EA or EIS unless the agency head determines that an action may have a significant environmental effect." 7 C.F.R. § 1b.4. However, this regulation does not exist in a vacuum. It is qualified by another USDA regulation-7 C.F.R. § 1b.3(c)-as follows: "[n]otwithstanding the exclusions listed in paragraphs (a) of this section and § 1b.4, or identified in agency procedures, agency heads may determine that circumstances dictate the need for preparation of an EA or EIS for a particular action. Agencies *shall continue to scrutinize their activities* to determine continued eligibility for categorical exclusion." 7 C.F.R. § 1b.3(c) (emphasis added). Defendants' interpretation of 7 C.F.R. § 1b.4 would exempt the FSIS from any duty to scrutinize its activities in violation of 7 C.F.R. § 1b.3(c).

Furthermore, pursuant to 7 C.F.R. § 1b.2, "[e]ach USDA agency is responsible for compliance with this part, the regulations of CEQ, and NEPA." 7 C.F.R. § 1b.2(b). CEQ regulations require that "[a]ny procedures [invoked by an agency] under this [categorical exclusion] section *shall provide for extraordinary circumstances* in which a normally excluded action may have a significant environmental effect." 40 C.F.R. § 1508.4 (emphasis added). Defendants' interpretation of 7 C.F.R. § 1b.4 as having required only a determination over twenty years ago that all "FSIS activities have no significant environmental impact," see Defs.' Reply at 5, belies any compliance with FSIS's obligation to "provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect."

Ultimately, the Court agrees that "any notion that USDA may avoid NEPA review simply by *failing* even to consider whether a normally excluded action may have a significant environmental impact flies in the face of the CEQ regulations," Pls.' Mem. for Summ. J. at 36, as well as USDA's own NEPA regulations.

[68] Mem. Op. at 39-41. While Cavel argues that the Interim Final Rule was categorically

excluded from NEPA review pursuant to both 7 C.F.R. § 1b.3 and 7 C.F.R. § 1b.4, see Cavel's Mem. to Stay Order at 17-18, Cavel ignores Federal Defendants' failure to invoke either exclusion in the record with respect to the promulgation of the Interim Final Rule. While Cavel further argues that "the district court decisions followed by this Court in support of its March 28, 2007 summary judgment ruling involved substantial questions concerning whether or not the agency action at issue fell within the scope of the agency's categorical exclusion or else a complete lack of any reference to the exclusion in the record," Cavel's Mem. to Stay Order at 18 n. 10, Cavel cannot differentiate the instant case via its legally and factually unsupported argument that "the comprehensive breadth of the FSIS's categorical exclusion under 7 C.F.R. § 1b.4" somehow exempts Defendants from actually invoking a categorical exclusion. *See* Cavel's Mem. to Stay Order at 21-22. Cavel's reliance on *Back Country Horsemen of America v. Johanns* for this argument is misplaced, as the court therein acknowledged that "the [USDA] does not argue that NEPA does not apply to actions undertaken by the Forest Service," whereas the Federal Defendants make precisely that argument in this case. *Back Country Horsemen of Am. v. Johanns,* 424 F.Supp.2d 89, 98 (D.D.C.2006). *See also Int'l Ctr. for Tech. Assessment v. Johanns,* 473 F.Supp.2d 9 (D.D.C.2007) ("Even where [the agency] has determined that an action falls under one of the enumerated exemptions, it must nonetheless determine whether an *exception* to the exemptions applies.").

**\*8** (2) Cavel further argues that "FSIS did in fact determine that there were no 'extraordinary circumstances' in which the Interim Final Rule 'may have a significant environmental impact,' and this was clearly reflected in the Administrative Record[.]" Cavel's Mem. to Stay Order at 16, 19-22. Again, the Court squarely dealt with this issue, briefed by all of the Parties, in its [68] Memorandum Opinion, and hereby incorporates its reasoning therein as set forth below:

The administrative record does not contradict Plaintiffs' assessment that "there is no evidence whatsoever that the 'agency head'-or any USDA official-even *contemplated* whether the rule 'may have a significant environmental effect' that should be considered in an EA or EIS, 7 C.F.R. § 1b.4, let alone made an affirmative contemporaneous determination that this exception to the general categorical exclusion for all FSIS programs should not apply here." Pls.' Mem. for Summ. J. at 32-33. *See also id.* at 36 ("[T]he Record contains no hint that USDA ever even considered whether the 'extraordinary circumstances' criteria applied to its decision.").

Initially, Defendant-Intervenors' attempted to interpret the Administrative Record as including documentation of Defendants' active invocation of the categorical exclusion via its Regulatory Review Workplan. *See* Def-Intervs.' Opp'n at 2. Specifically, Defendant-Intervenors expressed their interpretation of USDA-FSIS Regulatory Review Workplan # 05-007 (Nov. 23, 2005), A.R. at 202-206, as follows:

[T]wo documents in the Administrative Record-FSIS Directive No. 1232.4 and FSIS Regulatory Review Workplan No. 05-007-[ ] conclusively demonstrate that the FSIS considers the applicability of NEPA in **every** rulemaking action, including its promulgation of the Interim Final Rule. *See* FSIS Directive 1232.4, "Regulations Development and Clearance (Nov. 20, 2001) ("FSIS Directive," AR0192-AR0201), at pp. 9-10 (AR0200-0201); USDA-FSIS Regulatory Review Workplan # 05-007 (Nov. 23, 2005) ("Workplan," AR0202-0206). Moreover, the Administrative Record readily confirms that the FSIS specifically determined that further NEPA review was not required in conjunction with the agency's promulgation of the Interim Final Rule. *See* Workplan at p. 4 (AR0205).

Def-Intervs.' Opp'n at 5. Furthermore, Defendant-Intervenors argued that "[t]he Regulatory Review Workplan provides a specific mechanism by which the FSIS indicates for each rulemaking action whether an 'Environmental Impact Assessment' is required under NEPA. If further review is required, the agency checks a corresponding box in the

"Required Analysis" section to indicate such an affirmative determination. Here, the box is notably unchecked. The FSIS agency head and USDA Under/Assistant Secretary confirmed the determination that no further NEPA analysis was required by approving the Regulatory Review Workplan without comment." Def-Intervs.' Opp'n at 12 (internal citations omitted). *See also* Def-Intervs.' Mem. for Summ. J. at 3-4.

*\*9* However, Defendant-Intervenors' theory about what the Regulatory Review Workplan actually demonstrates is belied both by Federal Defendants' deafening silence with respect to this assessment as well as Defendant-Intervenors' eliminating this argument in their Reply. Notwithstanding Defendants' statement that "[c]onsistent with 7 C.F.R. § 1b.4 and FSIS's regulatory clearance directive, 'Environmental Impact Assessment' is not checked on the Workplan for the Interim Final Rule at issue thus indicating that neither an EA nor its EIS is required," Defs.' Mem. for Summ. J. at 11-12, it is clear, both from Defendants' legal position and statements that the box remained empty as a product of a wholesale approach to exclusion by FSIS, that neither the Secretary nor any proxy thereto every considered whether or not an "Environmental Impact Assessment" would be appropriate with respect to the Interim Final Rule. *See* Defs.' Mem. for Summ. J. at 12 ("Requiring the USDA to take any additional steps absent a finding of a significant environmental impact by the agency head would be redundant and superfluous....").

In Plaintiffs' Motion for Summary Judgment, Plaintiffs state that the Administrative Record submitted by Defendants "contained no NEPA documentation in connection with the rule or petition, nor any indication that any USDA official had ever given any consideration to whether an EIS or EA should be prepared." Pls.' Mem. for Summ. J. at 13. Defendants do not refute this. Accordingly, for the legal reasons set forth in Section III(B)(2) of this Opinion, and based on the factual findings above that FSIS never environmentally assessed the Interim Final Rule in any manner whatsoever, the Court concludes that Defendants have violated NEPA and its implementing regulations.

[68] Mem. Op. at 42-44. Despite Cavel's already-negated argument that "the agency head made ... a *negative* determination concerning the need for an 'Environmental Impact Assessment' by leaving its box unchecked and then signing the Workplan," Cavel's Mem. to Stay Order at 20, the record and Federal Defendants' lack of support for this theory more than clarify that Cavel's interpretation of the Workplan is wrong. *See* Pls.' Opp'n to Cavel's Mot. to Stay Order at 11-12.

(3) Finally, Cavel argues that "Plaintiffs utterly failed to meet their burden of proving that the Interim Final Rule 'may have a significant environmental impact' sufficient to support a determination that FSIS's determination of no 'extraordinary circumstances' was arbitrary and capricious." Cavel's Mem. to Stay Order at 16, 22-25. However, Cavel's argument assumes that Defendants actually made a finding of no extraordinary circumstances,[FN3] which as painstakingly detailed in the Court's March 28, 2007[68] Memorandum Opinion as well as the section above, never occurred. Accordingly, Plaintiffs do not shoulder the burden of proving that Defendants should have determined that extraordinary circumstances existed when it is clear from the record (and Federal Defendants' failure to support Cavel's interpretation thereof) that no environmental consideration of any kind was undertaken with respect to the Interim Final Rule. While the Court could ostensibly make a preliminary finding of significant environmental impact [FN4] based on the numerous unrefuted statements and declarations proffered by Plaintiffs, see [39] Pls.' Mem. for Summ. J. at 18-23; Pls.' Opp'n to Cavel's Mot. to Stay Order at 14-15, it would be inappropriate for the Court to do so at this juncture, as FSIS never assessed the environmental effects of the Interim Final Rule in the first instance.

FN3. Cavel frames its argument making said incorrect assumption: "As noted above, by completing and signing the Regulatory Review Workplan, FSIS's agency head determined that there were no 'extraordinary circumstances' that 'may have a significant

environmental effect' in connection with the Interim Final Rule. In order to prevail on their NEPA claim, Plaintiffs are required to prove that *this no extraordinary circumstances determination* was 'arbitrary and capricious,' a highly deferential standard of review." Cavel's Mem. to Stay Order at 22-23 (emphasis added).

FN4. *See, e.g.,* 40 C.F.R. § 1508.27(a), (b)(2), and (b)(4).

*\*10* In sum, Cavel has not demonstrated a likelihood, let alone a substantial likelihood, of success on the merits in its request for a stay of the Court's March 28, 2007 Order.


*B. Cavel has not demonstrated that it will suffer irreparable harm in the absence of a stay*

"Under this Circuit's precedent, the harms to each party are tested for 'substantiality, likelihood of occurrence, and adequacy of proof.' " *Judicial Watch,* 230 F.Supp.2d at 15 (quoting *Cuomo,* 772 F.2d at 976-77). As the D.C. Circuit has outlined, the moving party must establish (1) that "the injury must be both certain and great; it must be actual and not theoretical," *Wisconsin Gas Co. v. Fed. Energy Regulatory Comm'n,* 758 F.2d 669, 674 (D.C.Cir.1985); (2) that " '[t]he injury complained of [is] of such *imminence* that there is a "clear and present" need for equitable relief to prevent irreparable harm,' " *Id.* (quoting *Ashland Oil, Inc. v. Fed. Trade Comm'n,* 409 F.Supp. 297, 307 (D.D.C.1976), *aff'd,* 548 F.2d 977 (D.C.Cir.1976)) (emphasis in original); and (3) substantial unrecoverable economic harm, given the fact that "economic loss does not, in and of itself, constitute irreparable harm"; rather, " '[t]he possibility that adequate compensatory or other corrective relief will be available at a later date ... weighs heavily against a claim of irreparable harm,' " *id.* (quoting *Va. Petroleum Jobbers,* 259 F.2d at 925).

At the outset, the Court rejects Cavel's reliance on the Court's March 14, 2006[22] Memorandum Opinion on Plaintiffs' Motion for a Preliminary Injunction as the basis for its irreparable harm argument or other arguments, see, *e.g.,* Def.'s Mem. for Stay at 7, 11, 12, as the Court clearly indicated in that Opinion that insurmountable gaps in the information before it precluded any definitive assessment on the merits of Claim Three at that time. The Court fully and finally (as opposed to preliminarily) addressed Plaintiffs' Claim Three in its recent March 28, 2007[67] Order and [68] Memorandum Opinion, concluding that Defendants violated NEPA in promulgating the Interim Final Rule.

Cavel argues that the harm it suffers is certain and great because "[t]he March 28 Order forced Cavel to cease its operations immediately upon issuance of the Order[,]" threatening Cavel's business:

Cavel suffers not a mere economic or monetary loss for which it can be easily compensated. The company operates a multi-million dollar facility,[FN5] which is profitable but also expensive to maintain, particularly when the company has been forced to shut down. Moreover, long-standing Cavel customers in Europe ... will now turn to other North American suppliers for their meat. It will be very difficult ... for Cavel to ever regain its customers from its Canadian competitors. Likewise, Cavel will lose long-term, qualified employees....

FN5. According to the Declaration of Jennifer L. Fearing, Chief Economist for Plaintiff The Humane Society, the most recent assessed value of the property is less than $400,000. *See* Pls.' Opp'n to Cavel's Mot. to Stay Order, Ex. 2 ¶ 10 & Attach. G (Fearing Decl.).

Finally, Cavel has no other avenue to even temporarily ensure the continued operation of the slaughterhouse or employment of its workers.

***11*** Cavel's Mem. to Stay Order at 8-9 (internal citations omitted). Cavel relies on *Holiday Tours* and *Wisconsin Gas Co.* for its argument that "[c]essation of a business is clearly an 'irreparable harm.' " *Id.* at 8 (citing *Wisconsin Gas. Co., 758 F.2d at 674; Holiday Tours,* 559 F.2d at 843 n. 2).<sup>FN6</sup>

FN6. While Cavel attempts to argue on behalf of third parties-including specifically, its "fifty production workers"-in the context of irreparable harm, Cavel does not demonstrate why such interests would be appropriately considered by the Court in assessing the irreparable harm to Cavel as required under this prong of the Court's analysis. Cavel's Mem. to Stay Order at 9. *See Va. Petroleum Jobbers,* 259 F.2d at 926-27 ("The question of harm to others if a stay were granted is not really before us. Except insofar as it may reflect on the public interest in saving taxpayers and consumers needless expense, we do not think petitioner has standing to complain of potential losses or inconvenience to the other parties in this case."). Neither does Cavel assert standing to argue on behalf of "[c]olleges and universities [that] will no longer benefit from other horse byproducts to conduct research and educate students." Cavel's Mem. to Stay Order at 10. To the extent that these arguments would more appropriately factor into the Court's assessment of whether a stay would be in the public interest, the Court concludes that the alleged harms stated above are 1) unsupported by declarations from even one production worker or any college or university allegedly harmed, and 2) are outweighed by the public's interest in the promulgation of regulations that comply with federal law. Neither does Cavel's tax contribution support a finding of significant harm to the DeKalb community in the event of its closure. *See* Pls.' Opp'n to Cavel's Mot. to Stay Order at 27.

However, "[i]t is ... well settled that economic loss does not, in and of itself, constitute irreparable harm." *Wisconsin Gas Co., 758 F.2d at 674.* "The key word in this consideration is *irreparable,"* and "[r]ecoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business." *Id.* (internal quotation omitted). *See also Holiday Tours,* 559 F.2d at 843. As Plaintiffs point out:

Cavel cannot meet the irreparable harm standard because, among other issues, it has not established that the Court's order threatens the "very existence" of its business. *Wisconsin Gas Co., 758 F.2d at 674.* Neither of the declarations filed by Cavel even *allege,* much less prove, that Cavel will go out of business, or cease to exist, if Cavel cannot operate its plant during the pendency of the appeal, or during the USDA's compliance with NEPA. At most, Cavel's declarations identify potential economic losses from temporary cessation of the DeKalb plant's operations ... which is *per se* inadequate to establish irreparable harm under Circuit precedent.

Pls.' Opp'n to Cavel's Mot. to Stay Order at 18. In fact, Cavel previously ceased all operations for a period of two years due to a fire and managed to resume operations. *Id.* at 19; Cavel's Mot. to Stay Order, Ex. 1 ¶ 9 (Declaration of Luc Van Damme, President of Cavel International, Inc.). Furthermore, Cavel is a subsidiary of a larger corporate entity, Velda NV, and Cavel has made no claim that a closure of its plant will threaten this entity as a whole. Pls.' Opp'n to Cavel's Mot. to Stay Order at 19, Ex. 2 ¶ 4 (Fearing Decl.). *See Sandoz, Inc. v. Food & Drug Admin.,* 439 F.Supp.2d 26, 32 (D.D.C.2006). Cavel has not established that its losses are great relative to the size of the business. *See Lightfoot v. District of Columbia,* Civ. No. 01-1484, 2006 WL 175222 at *7, 8 (D.D.C. Jan. 24, 2006). Additionally, many of the "losses" alleged by Cavel can in fact be mitigated, for example, by the sale of supplies and/or the termination of rent payments (as the owner of the facility is Cavel President Van Damme himself). Pls .' Opp'n to Cavel's Mot. to Stay Order at 19, Ex. 2 ¶ 10 (Fearing Decl.); Cavel's Mot. to Stay Order, Ex. 2 ¶¶ 12, 13 (Declaration of James Tucker, General Manager of Cavel International, Inc.). Finally, the loss of "$2 million" in gross sales and supposed "extreme difficulty" regaining customers

in the future alleged by Mr. Van Damme, see Van Damme Decl. ¶¶ 8, 10, are respectively insufficient (in light of mitigating measures that can be taken and the reach of Cavel's parent company) and speculative. *See* *Lightfoot,* 2006 WL 175222 at *8 ("relatively modest losses are insufficient to meet the standards required for 'irreparable injury' "); *Bristol-Myers Squibb Co. v. Shalala,* 923 F.Supp. 212, 220-21 (D.D.C.1996) (finding no irreparable harm where movant would lose $80 million dollars, less than 1% of its total sales); *Mylan Pharma., Inc. v. Shalala,* 81 F.Supp.2d 30, 42-43 (D.D.C.2000) ("Courts within this Circuit have generally been hesitant to award injunctive relief based on assertions about lost opportunities and market share."). In sum, Cavel has not demonstrated irreparable injury warranting a stay of the Court's March 28, 2007 Order.

### C. Harm to Plaintiffs

***12*** As with irreparable harm to the movant, harms to other parties interested in this action are tested for "substantiality, likelihood of occurrence, and adequacy of proof." *Judicial Watch,* 230 F.Supp.2d at 15 (quoting *Cuomo,* 772 F.2d at 976, 977). "Relief saving one claimant from irreparable injury, at the expense of similar harm caused another, might not qualify as the equitable judgment that a stay represents." *Del. River Port Auth. v. Transamerican Trailer Transp., Inc.,* 501 F.2d 917, 924 (3d Cir .1974) (quoting *Va. Petroleum Jobbers,* 259 F.2d at 925).

Cavel argues that Plaintiffs will not be harmed by a stay of the Court's Order because "any potential harm to Plaintiffs is merely theoretical." Cavel's Mem. to Stay Order at 10. Cavel defines Plaintiffs' alleged injuries as 1) "caused by the USDA's failure to comply with the APA and NEPA, which has allegedly affected the animal advocacy organizations' ability to engage in education, legislative, and advocacy activities," and 2) individual Plaintiffs' aesthetic injuries. *Id.* at 10. Cavel argues that because it will ostensibly prevail on the merits of its NEPA claim on appeal and because the alleged harms to individual Plaintiffs cannot be "irreparable" because of Cavel's duty to comply with environmental, sanitary and animal protection laws, the Court should discount such alleged harms to Plaintiffs. *Id.* at 10-11.

The Court has already rejected the first of Cavel's arguments (that it will allegedly prevail on the merits) in Section III(A) of this Opinion, but notes nonetheless that Cavel's argument does not address any actual *harm* to Plaintiffs. As to Cavel's second argument, even assuming *arguendo* that Cavel had actually complied with environmental, sanitary, and protection laws as it alleges, such compliance would not belie the environmental and aesthetic harms alleged by individual Plaintiffs as attached to the Amended Complaint and reiterated in attachments to Plaintiff's Opposition to Cavel's Emergency Motion to Stay the Court's March 28, 2007 Order. *See generally* Pls.' Opp'n to Cavel's Mot. to Stay Order, Exs. 1, 3, 4, 6, 7, 8. "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable." *Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 545, 107 S.Ct. 1396, 1404, 94 L.Ed.2d 542 (1987).

### D. The Public Interest does not favor a stay of the Court's Order requiring a federal agency to comply with NEPA

"The public interest is a uniquely important consideration in evaluating a request for [interim relief]." *Am. Cetacean Soc'y,* 604 F.Supp. at 1416 (quoting *Nat'l Ass'n of Farmworkers Orgs. v. Marshall,* 628 F.2d 604, 616 (D.C.Cir.1980)). In its March 28, 2007 Memorandum Opinion, in considering whether the Court should vacate the Interim Final Rule or allow it to remain in place on remand to the agency, the Court noted:

**\*13** Pursuant to the case law in this Circuit, vacating a rule or action promulgated in violation of NEPA is the standard remedy. *See Am. Bioscience, Inc. v. Thompson,* 269 F.3d 1077, 1084 (D.C.Cir.2001) ("If an appellant has standing-which is undeniable here-and prevails on its APA claim, it is entitled to relief under that statute, which normally will be a vacatur of the agency's order ."). *See also Greater Yellowstone Coal. v. Bosworth,* 209 F.Supp.2d 156, 163 (D.D.C.2002) ("As a general matter, an agency action that violates the APA must be set aside. As this Circuit explained in *American Bioscience, Inc. v. Thompson,* 269 F.3d 1077 (D.C.Cir.2001), if a plaintiff 'prevails on its APA claim, it is entitled to relief under that statute, which normally will be a vacatur of the agency's order.' *Id.* at 1084. Based on this authority, I shall vacate the permit, with the understanding that the Service can reissue another permit if and when the NEPA record of decision so allows."); *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,* 145 F.3d 1399, 1409 (D.C.Cir.1998) ( "We have made clear that when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated ...." (internal quotation omitted)).

...

Neither Defendants nor Defendant-Intervenors have pointed to either a compelling reason, environmental or otherwise, to leave the Interim Final Rule in place pending NEPA review, nor that doing so would preserve NEPA-contemplated opportunities for FSIS.... Accordingly, the Court shall vacate the Interim Final Rule, which was promulgated in violation of NEPA-mandated procedures and in violation of the law.

[68] Mem. Op. at 46-48.

The effect of the Court's Order is to vacate an illegally promulgated agency rule. *See FCC v. Nextwave Personal Commc'ns,* 537 U.S. 293, 300, 123 S.Ct. 832, 154 L.Ed.2d 863 (2003) (The APA "requires federal courts to set aside federal agency action that is 'not in accordance with law,' ... which means of course *any* law...."); *Nev. v. Dep't of Energy,* 457 F.3d 78, 85 (D.C.Cir .2006) ("The APA requires that we set aside agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " (internal citation omitted)). Cavel, on the other hand, has not demonstrated why a stay of this Order would be in the public interest. The Court has already addressed Cavel's argument that the public interest would favor a stay which in turn would save the jobs of Cavel's employees, none of whom has provided a supporting affidavit or declaration on his or her own behalf. *See infra* at 17 n. 6. Cavel's other two arguments fare no better. Cavel argues that "the public has an interest in federal agencies' enforcement of Congressional will [,]" and that "the conference report accompanying the Appropriations Act explained that '[i]t is the understanding of the conferees that the Department is obliged under existing statutes to provide for the inspection of meat intended for human consumption (domestic and exported).' " Cavel's Mem. to Stay Order at 25-26. For Cavel, who has throughout the course of this litigation argued that the FY 2006 Amendment "effects only a change in the source of funding for the ante-mortem inspection of horses conducted by the FSIS," [38] Def.-Intervs' Mem. to Dismiss or for Summ J. at 4, to argue that the Court should infer that this section of the conference report for an appropriations bill *eliminating funding* for inspection services actually evinces an intention to *provide* such services presses the boundaries of good faith. Second, Cavel's statement that "this is not a case where the agency regulating Defendant-Intervenor's operations or any court has ruled that 'the service performed by [Cavel] is contrary to the public interest[,]" Cavel's Mem. for Stay at 26, is unpersuasive, as Cavel cannot argue that continuity of its operations is in the public interest by stating that such continuity would not be *against* the public interest.

**\*14** The Court finds that a stay of its March 28, 2007 Order would not be in the public interest, and particularly in light of Cavel's failure to demonstrate a likelihood of success

on the merits and adequately demonstrate irreparable injury, the Court finds that a balancing of the factors enumerated above supports denying Cavel's request for a stay.

## IV. CONCLUSION

Based on the aforementioned reasoning, the Court shall DENY Defendant-Intervenor Cavel's [69] Emergency Motion for a Stay of the Court's March 28, 2007 Order. An Order accompanies this Memorandum Opinion.

D.D.C.,2007.
Humane Society of U.S. v. Johanns
Slip Copy, 2007 WL 1120404 (D.D.C.)

Service: **Get by LEXSEE®**
Citation: **2004 US Dist Lexis 28928**

*2004 U.S. Dist. LEXIS 28928, ***

JAMAL J. KIFAFI, et al., Plaintiffs, v. HILTON HOTEL RETIREMENT PLAN, et al., Defendants.

Civil Action No. 98-1517 (CKK)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

2004 U.S. Dist. LEXIS 28928

September 27, 2004, Decided
September 27, 2004, Filed

**SUBSEQUENT HISTORY:** Class certification granted by Kifafi v. Hilton Hotel Ret. Plan, 228 F.R.D. 382, 2005 U.S. Dist. LEXIS 5693 (D.D.C., 2005)

**PRIOR HISTORY:** Kifafi v. Hilton Hotels Retirement Plan, 2000 U.S. Dist. LEXIS 17967 (D.D.C., Dec. 7, 2000)

**CORE TERMS:** intervenors', intervene, exhaustion, counting, class representative, failure to exhaust, pension plan, futile, exhaustion requirement, years of service, statutory claim, review process, excused, retirement plan, administrative remedies, class certification, vesting, credited, class action, inappropriate, exhausted, futility, exhaust, case law, nonexhaustion, fiduciary, futility exception, failed to exhaust, notice, independent cause of action

**COUNSEL:** **[*1]** For JAMAL J. KIFAFI, individually, and on behalf of all others similarly situated, Plaintiff: Stephen Robert Bruce, Washington, DC.

For HILTON HOTEL RETIREMENT PLAN, HILTON HOTELS CORPORATION, JAMES M. ANDERSON, members of the Hilton Hotels Retirement Plan Committee, MATTHEW J. HART, members of the Hilton Hotels Retirement Plan Committee, BARRON HILTON, DIETER HUCKESTEIN, members of the Hilton Hotels Retirement Plan Committee mem, SAM D. YOUNG, JR., members of the Hilton Hotels Retirement Plan Committee, Defendants: Robert N. Eccles, Karen M. Wahle, O'MELVENY & MYERS LLP, Washington, DC.

For EDNA OGBONNA, FANNY CANAR, EDNA OGBONNA, FANNY CANAR, MARC TOUSSAINT, Movant: Stephen Robert Bruce, Washington, DC.

**JUDGES:** COLLEEN KOLLAR-KOTELLY, United States District Judge.

**OPINION BY:** COLLEEN KOLLAR-KOTELLY

**OPINION: MEMORANDUM OPINION**

(September 27, 2004)

Presently before the Court is Intervenors' Motion to Intervene as Named Representatives in Support of Vesting Service Claim [147]. Three individuals, Edna Ogbonna, Fanny Canar and Marc Toussaint, have requested leave to intervene in Plaintiffs' suit, brought under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, **[*2]** *et seq.* Simultaneously, the Plaintiffs are seeking class certification on their service counting claims under Federal Rules of Civil Procedure 23(a) and 23(b)(2), which will be

addressed in a separate Memorandum Opinion and Order.

After reviewing this motion, the parties' briefing, n1 and the applicable law, the Court determines that the Motion to Intervene must be denied because the three individuals have failed to exhaust the internal administrative procedures for their claims, and as a result intervention would be inappropriate.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 The Court also provided the parties with an opportunity to file factual and legal updates in May 2004. Both Plaintiffs and Defendants did so, and the Court has considered these filings as well. See Docket Entries [160], [162].

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 1998, Mr. Kifafi, a former employee of the Hilton Hotels Corporation, brought this suit against the Hilton Hotels Retirement Plan and various other Hilton entities and executives (collectively "Hilton"). **[*3]** Mr. Kifafi alleged that Hilton improperly calculated the retirement benefits to which he and other similarly situated Hilton employees are entitled. Mr. Kifafi originally raised two claims that he argued were appropriate for class certification under Federal Rule of Civil Procedure 23. In an Order issued on May 11, 1999, the Court certified a class of plaintiffs for the first claim, known as the "benefit accrual claim," with Mr. Kifafi as the named class representative. *Kifafi v. Hilton*, 189 F.R.D. 174, 176-78 (D.D.C. 1999) (order granting in part and denying in part motion for class certification). In that same Order, the Court declined to certify a class for Mr. Kifafi's second claim, known as the "service counting claim," finding that Mr. Kifafi was not an appropriate class representative. n2 *Id.* at 178-80.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 The Court discussed this claim as having five subparts, for each of which Mr. Kifafi was an inappropriate class representative. The first subpart involved a question of whether Hilton had properly credited Mr. Kifafi for his years of service as a union employee for vesting purposes. *Kifafi*, 189 F.R.D. at 179. The Court found that Mr. Kifafi's union service credit was adjusted to reflect his union service as part of the claims appeal process prior to the filing of this lawsuit, and that consequently, Mr. Kifafi's union service claim was moot, and he could not serve as a class representative for this issue. *Id.* The Court subsequently indicated a willingness to revisit its finding that Mr. Kifafi's union service claim was moot if there was a basis for doing so. *See* Pls.' Reply at 7. Plaintiffs now present evidence that they argue indicates Mr. Kifafi was not fully credited with his years of union service, *id.*; Pls.' Mot. to Cert. at 32-33.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*4]**

Subsequently, Plaintiffs have attempted to cure the deficiencies in their earlier motion for class certification on their service counting claim. Towards this end, three individuals n3 have moved to intervene, "seeking to change their role in the litigation from absent class members to named representatives to ensure that all service-counting claims can be certified." Mot. to Intervene at 4-5.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n3 These three individuals state that they each qualify as members of the certified benefit accrual class.

Mot. to Intervene. at 4.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

## II. DISCUSSION

The three proposed Intervenors, Ms. Ogbonna, Ms. Canar and Mr. Toussaint, state that they worked for Hilton for more than the five years required to earn vested rights to retirement benefits under Hilton's Retirement Plan. Mot. to Intervene at 1. They also state that they each worked in both union and non-union jobs during the course of their employment with Hilton, but that in calculating their years of service for purposes of vesting, Hilton only credited them with **[*5]** their years of "participation" in the plan during their non-union service. *Id.* They further state that they were not provided with any notice about their rights to benefits after they were no longer in Hilton's employ. *Id.* Without reaching the merits of these claims, the Court finds that the Intervenors are not proper named plaintiffs in this action because they have failed to exhaust the internal claims procedures available to them under the Hilton Retirement Plan. To adequately represent the proposed service counting class, the Intervenors must themselves have a proper service counting claim to pursue. In the absence of such a claim, the Court shall deny the Motion to Intervene.

Section 503 or ERISA, 29 U.S.C. 1133, requires companies to provide a claims procedure available following the denial of benefits to a plan participant. n4 Although ERISA "does not specifically require the exhaustion of remedies available under pension plans, courts have applied this requirement as a matter of judicial discretion." *Communications Workers of Am. v. AT&T*, 309 U.S. App. D.C. 170, 40 F.3d 426, 432 (D.C. Cir. 1994) (citations omitted). "It is well established that, barring **[*6]** exceptional circumstances, plaintiffs seeking a determination pursuant to ERISA of rights under their pension plans must . . . exhaust available administrative remedies under their ERISA-governed plans before they may bring suit in federal court." *Id.* at 431.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 29 U.S.C. 1133 states that "every employee benefit plan shall . . . afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim."

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Intervenors' position, however, is that they should not be held to this exhaustion requirement for three reasons. n5 First, Intervenors argue that exhaustion is not required for so-called statutory ERISA claims, and that their claims should be categorized as statutory, thereby excusing their failure to exhaust the Retirement Plan's claim procedures. *See* Mot. to Intervene at 12-13; Pls.' Reply at 20-23. Second, Intervenors argue that their failure to exhaust **[*7]** is excused because Mr. Kifafi has exhausted the claim procedure. Mot. to Intervene at 13-14; Pls.' Reply at 23-25. Finally, Intervenors argue that their failure to exhaust is excused under the futility exception to the exhaustion requirement. Mot. to Intervene at 14-16; Pls.' Reply at 23.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n5 There is no dispute over the fact that Intervenors have not exhausted the Retirement Plan's internal claim procedures. The Court ordered the parties to file any necessary factual and legal updates by May 28, 2004 [159], and both parties did so. The Court's Order also required the parties to continue to file such

notices on an ongoing basis in the event that any further factual or legal developments occur. No further information has been filed with the Court, so the Court understands that there has been no change in Intervenors' status with respect to exhaustion of their claims.


- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

## A. Exhaustion

## 1. Intervenors Claims are Not Statutory

Intervenors state that exhaustion is not required for statutory claims, **[*8]** citing several decisions from the judges on this District Court. *See* Mot. to Intervene at 13. Although Intervenors overstate their position, n6 there is legal support for their argument. Judge Stanley Harris noted in *Coleman v. Pension Benefit Guar. Corp.*, 94 F. Supp. 2d 18 (D.D.C. 2000), that the circuits are divided on the question of whether the exhaustion requirement applies to statutory claims, and that the District of Columbia Circuit has not weighed in on this issue. *Id.* at 22. The Court in *Coleman* joined the reasoning of the other judges on this Court, as well as the Third and Seventh Circuits, holding that the requirement that a plaintiff exhaust ERISA claims "does not apply to claims asserting statutory violations." *Id.* at 23; *see also Greer v. Graphic Comm. Int'l Union Officers*, 941 F. Supp. 1 (D.D.C 1996); *Garvin v. American Ass'n of Retired Persons*, 1992 U.S. Dist. LEXIS 2013, 1992 WL 693382 (D.D.C. 1992); *Rauh v. Coyne*, 744 F. Supp. 1186 (D.D.C. 1990).


- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -


n6 Intervenors neglect to point out that there is a split among the circuits on this question.


- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*9]**

Although there is clear law, albeit not binding, supporting Intervenors argument that statutory claims are exempt from the well established exhaustion principle, the Court need not make a determination on that issue because it determines that Intervenors claims are not in fact statutory. In the Motion to Intervene, Intervenors make the conclusory statement that "[a] fiduciary's failure to count all years of service for vesting as required by ERISA is definitely a statutory issue," supported by only one case citation. *See* Mot. to Intervene at 13 (citing *Gauer v. Connors*, 953 F.2d 97 (4th Cir. 1991). Upon examination, *Gauer* simply does not stand for the proposition Intervenors suggest. *Gauer* involved an examination of whether pension plan trustees' interpretation of their plan was consistent with ERISA regulations, and required the Fourth Circuit to consider the proper interpretation of ERISA's statutory language. Nowhere does the *Gauer* court address the difference between a statutory and non-statutory claim, not does it clarify the question of whether a fiduciary's failure to count all years of service for purposes of vesting is a statutory claim. **[*10]**

Intervenors also cite to *Air Line Pilots Ass'n, Int'l v. Northwest Airlines, Inc.*, 200 U.S. App. D.C. 219, 627 F.2d 272 (D.C. Cir. 1980), in support of their argument that Intervenors raise a statutory claim. n7 *See* Pls.' and Intervenors' Reply ("Reply") at 22. The Court is not persuaded by Intervenors' attempt to massage the case law into a shape that suits their purposes. In the course of its substantive discussion, *Air Line Pilots* distinguishes between different types of ERISA claims, describing one type as an allegation "that [an employer's] conduct violated the terms and conditions of the pension plan and in doing so gave the [employee] a claim under ERISA, and describing another type as alleging that a plan "conflicts with ERISA's statutory requirements. . . ."


- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -


n7 They also cite *Air Line Pilots* for the proposition that exhaustion is not required for statutory claims.

Reply at 21. However, Plaintiffs and Intervenors misread this case, which dealt instead with the interaction of the ERISA statute and the Railway Labor Act, 45 U.S.C. §§ 151, *et seq.*, and the question of whether the Railway Labor Act's compulsory arbitration requirements took precedence over ERISA's provisions allowing such suits to be brought in federal court. Intervenors' other case citations are similarly unpersuasive. For example, *Smith v. Conti*, 205 F.3d 597 (3d Cir. 2000), discussed whether the construction of a particular plan compliance with ERISA, and *Holt v. Winpisinger*, 258 U.S. App. D.C. 343, 811 F.2d 1532 (D.C. Cir. 1987), involved the question of whether an individual was an employee under the ERISA statute and common law principles of agency.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*11]**

Nothing in the case law cited by Intervenors indicates that they have raised claims that should be considered statutory. A statutory claim would be brought under an ERISA provision such as ERISA § 510, 29 U.S.C. § 1140, which provides an independent cause of action against employers who interfere with an employees ERISA rights. In the instant case, Intervenors do not argue that the Hilton Retirement Plan itself violates ERISA's mandates, or that ERISA provides an independent cause of action for Intervenors to pursue. Rather, Intervenors claim that the terms of the Hilton Plan were not properly applied to them. n8

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n8 While it may be a violation of ERISA to improperly apply the terms of a plan to one of its participants, that does not in fact mean that any claim implicating an ERISA-governed retirement plan is in fact a statutory claim for exhaustion purposes.

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Intervenors' proposed complaint, *see* Mot. to Intervene Attach. 1, adopts Plaintiffs' claims as presented in their First Amended **[*12]** Class Action Complaint, *see id.* Attach. 1, Ex. A. The service counting claim alleges that "Defendants have violated the [Hilton] Retirement Plan by not counting years of service in union employment in computing years of credited service." *Id.* Attach. 1, Ex. A at 16. By their own language, Intervenors (and Plaintiffs) are alleging that Defendants violated the terms of the Retirement Plan. As Defendants point out in their opposition brief, Intervenors' counsel reasserted this in open court on July 24, 2003. When asked by the Court whether counsel agreed "that the plan sets out a policy that they would get credit for [preparticipation service]," Intervenors' counsel replied: "Right. The plan would indicate they are getting credit for that, but as a systematic matter people were not getting credit before the year in which they became a participant in the plan." Defs.' Opp. at 33 n. 24. Intervenors are alleging that Hilton's conduct violated the terms and conditions of their pension plan, which in turn creates a claim under ERISA. This type of challenge to Hilton's conduct is not a statutory claim, and Intervenors' failure to exhaust cannot be excused on those grounds.

**[*13] 2. Futility Exception is Unavailable**

In the alternative, Intervenors argue that their nonexhaustion should be excused on the grounds that requiring Intervenors to fully exhaust Hilton's internal review procedures would be futile. *See* Mot. to Intervene at 14-16; Reply at 23. Relying on a Sixth Circuit case, Intervenors argue that exhaustion should not be required when systemic violations are alleged, and "resorting to the plan's administrative procedure would simply be futile or the remedy inadequate." Reply at 23 (quoting *Fallick v. Nationwide*, 162 F.3d 410 (6th Cir. 1998)).

The District of Columbia Circuit has recognized that a discretionary exception to the exhaustion of administrative remedies requirement exists when exhaustion of a plan's review process would be futile. *See Communications Workers*, 40 F.3d at 432. However, the standard for a finding of futility is a high bar that Intervenors cannot clear. In order to excuse exhaustion on the basis of futility, the Court would have to find

"the certainty of an adverse decision," and that requiring Intervenors to exhaust the available process would be "clearly useless." *Id.* (citations **[*14]** omitted).

The Court cannot find that Intervenors' use of Hilton's internal claims procedures would be "clearly useless," or that an adverse result is a "foregone conclusion," *id.* at 344, because Hilton has indicated a willingness to reconsider its earlier denial of benefits. In its opposition, Hilton states that Intervenors are entitled to relief of the sort they seek via this lawsuit, and would in fact receive it through the internal claims procedure. n9 Defs.' Opp. at 36-7. Whether or not

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -


n9 Furthermore, Hilton has amended its retirement plan in several ways, and has undertaken a review of its records on its pension plan participants. *See* Defs.' Notice of Intervening Changes in Facts and Applicable Case Law [160] at 2-4.


- - - - - - - - - - - End Footnotes - - - - - - - - - - - - -

Intervenors doubt the sincerity of Hilton's willingness to reconsider their claims, it is clear to the court that Intervenors may in fact find resolution through the available internal process. Intervenors argue that the number of similarly situated individuals indicates that exhaustion **[*15]** would be futile. Mot. to Intervene at 14; Reply at 23. However, this Circuit has not found this to be a persuasive argument. In *Communications Workers*, the Circuit Court overturned the District Court's finding that exhaustion was futile "because Plan administrators had consistently interpreted the Plan to deny . . . initial claims. . . ." *Communications Workers*, 40 F.3d at 432. The Court of Appeals found that, "because the Plan's final review authority . . . never had an opportunity to render a final determination on appellees claims, we fail to see any basis for finding that an unfavorable decision by that Committee was a foregone conclusion." *Id.* at 433. Finally, the Court notes the Circuit Court's explanation that "even if one were to concede that an unfavorable decision . . . was *highly likely*, that does not satisfy our strict futility standard requiring a *certainty* of an adverse decision." *Id.* (emphasis in original). In the instant case, there is simply nothing to suggest that Intervenors face such a certain adverse result, and consequently the futility exception to the exhaustion requirement is unavailable.

Intervenors lament **[*16]** the possibility that any attempt to intervene might be met with the same cold eye towards nonexhaustion. Mot. to Intervene at 19-20. Without making any determinations on that question, the Court notes that this argument is unavailing. If, as the Court has found, there is some possibility that a potential plaintiff would receive a favorable outcome through exhaustion of Hilton's internal claims procedures, then the purposes of the exhaustion are achieved; time and resources may be conserved by both the parties and the Court by requiring exhaustion. The fact that Intervenors might *prefer* to proceed directly to the litigation stage and pursue a class action does not change the Court's analysis.

## 3. Kifafi's Exhaustion Does Not Suffice

Intervenors' remaining argument is that they should not be required to exhaust their available administrative remedies because Mr. Kifafi has exhausted with respect to his service counting claims. *See* Mot. to Intervene at 13-14; Reply at 23-25. In support of their position, Intervenors cite to *Foster v. Gueory*, 211 U.S. App. D.C. 89, 655 F.2d 1319, (D.C. Cir. 1981), n10 in which the Circuit Court held that individual exhaustion was not required **[*17]** for plaintiffs in a Title VII class action. After an examination of the Court of Appeals' reasoning in *Foster*, the Court determines that the analysis is not applicable to the instant ERISA suit. In the absence of any law indicating that the same approach should be followed in the ERISA context, the Court finds that Kifafi's exhaustion does not excuse Intervenors own failure to do so.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n10 Intervenors also refer to _Cook v. Boorstin_, 246 U.S. App. D.C. 201, 763 F.2d 1462 (D.C. Cir. 1985), which reiterated the Court of Appeals' holding in _Foster_. Mot. to Intervene at 13-14

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

In _Foster_, the Circuit Court stated that, although Title VII plaintiffs are generally required to file a timely discrimination charge with the Equal Employment Opportunity Commission ("EEOC") before bringing suit in federal court, individual plaintiffs in Title VII class action suits did not need to file a complaint with the EEOC if at least one member of the plaintiffs class had done so. The _Foster_ court indicated that the rationale had **[*18]** "been extended to situations where no class action had been certified, but where the court was nonetheless able to treat as a class a plaintiff who had satisfied the EEOC filing requirement and one or more plaintiffs who had not satisfied that requirement." _Id. at 1322_. In determining which Title VII actions fit within this approach, the Circuit Court stated that "the critical factor in determining whether an individual Title VII plaintiff must file an EEOC charge, or whether he may escape this requirement by joining with another plaintiff who has filed such a charge, is the similarity of the two plaintiffs' complaints." _Id_. The Court of Appeals noted that "if it was impossible for the EEOC to effectuate a settlement of the original plaintiffs' claims, there is no reason to believe that the EEOC would be successful in settling appellants' claims." _Id. at 1323_.

Intervenors provide no case law that would suggest that the rationale in _Foster_ has ever been applied to the ERISA context, and the Court has found no such application in this jurisdiction or elsewhere. The _Foster_ decision deals with the specific circumstances of discrimination suits under Title VII, cites **[*19]** almost exclusively to other Title VII decisions, and is not drafted in a manner so broad that the Court is persuaded that the rationale was intended to be applied outside the Title VII context. Defendants draw a distinction between the purposes of the available administrative remedies in the Title VII and ERISA contexts, and this distinction bolsters the Court's initial impression that _Foster_ and its Title VII progeny are not intended to apply in the ERISA arena.

Defendants note that under Title VII, the required filing of an EEOC charge serves the purposes of notice to defendants and narrowing of issues, but the EEOC "is not empowered to decide claims or award relief [and] the exhaustion requirement is satisfied by filing a charge with the EEOC even if the claim if never officially denied, and even if it is never investigated by the agency." Defs.' Opp. at 34-35. The review process under an ERISA-governed pension plan "is conducted internally by plan administrators with authority not only to investigate claims but also to grant relief where warranted." _Id_. at 35. While the exhaustion requirement under Title VII is satisfied simply by the filing of a charge, in the ERISA **[*20]** context, exhaustion requires that a determination be reached. Requiring exhaustion in an ERISA suit ensures that the Court is presented with live claims, while requiring exhaustion in a Title VII case may or may not achieve this result. n11

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n11 Plaintiffs respond by arguing that the Court should be less stringent with exhaustion requirements under ERISA than in the Title VII arena, because an EEOC charge is brought before an independent agency, while an ERISA review process is conducted by internal plan trustees. _See_ Reply at 24. However, courts have rejected the notion that an ERISA review process is suspect simply because it is conducted by an employer's management. _See, e.g._, _Communications Workers_, 40 F.3d at 433 ("The court will not assume that, merely because members of a pension plan review committee are drawn from a company's management, the review committee will never reach an interpretation of the plan different from that of the company.").

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**B. The Federal Rules Do Not Provide  [*21]  a Basis for Intervention**

Intervenors submit that their Motion to Intervene should be granted pursuant to Federal Rule of Civil Procedure 24, in order that they may serve as named class representatives. Intervenors claim that their motion is appropriate under both Rule 24(a), which governs "intervention of right," and Rule 24(b), which governs "permissive intervention." Mot. to Intervene at 5-11. Intervenors also state that Rule 23(d) supports their motion, because it authorizes the Court to invite intervention where a replacement class representative is needed. Id. at 3. The Court finds, however, that Intervenors' motion must be denied. The Federal Rules of Civil Procedure contemplate intervention in a class action suit where, in the absence of an appropriate class representative, intervenors themselves could properly fulfill that role. However, as the Court has explained above, Intervenors have not exhausted Hilton's internal claims review process, and are consequently not in a position to represent the putative service counting class.

The underpinning of Intervenors' argument is that "intervention should be freely allowed to preserve class claims,'" Mot. to Intervene **[\*22]** at 2 (quoting Newburg on Class Actions (3d ed.), § 2.26), and that "intervention like this often occurs when a court determines that there is a subclass which the named representatives may not adequately represent." Mot. to Intervene at 2-3. Intervenors also cite to two other cases, Fink v. Nat'l Savings & Trust Co., 772 F.2d 951, 249 U.S. App. D.C. 33 (D.C. Cir. 1986), and Link v. Daimler-Benz, 788 F.2d 918, 929 (3d Cir. 1986), for the proposition that the courts should allow additional plaintiffs to intervene as class representatives when an original class representative proved unable to adequately represent the class. See Mot. to Intervene at 3. In the instant case, however, this generally liberal approach to intervention does not support the Motion to Intervene because the Court has found that the three proposed Intervenors would not be appropriate class representatives due to their unexcused failure to exhaust administrative remedies.

The fact that Intervenors' failure to exhaust their available remedies makes them inappropriate class representatives impacts the Court's consideration of the timeliness of their Motion to Intervene. Rules 24(a) and 24(b) both **[\*23]** require that a motion to intervene be timely filed, and the Court considers "time elapsed since the inception of the suit, n12 the purpose for which intervention is sought, the need for intervention as a means of preserving the applicant's rights, and the probability of prejudice to those already parties in the case." Smoke v. Norton, 346 U.S. App. D.C. 277, 252 F.3d 468, 471 (D.C. Cir. 2001). In the instant case, consideration of the purpose for which intervention is sought proves fatal to Intervenors' argument that their motion is timely. Intervenors moved to intervene, "seeking to change their role in the litigation from absent class members to named representatives to ensure that all service-counting claims can be certified." Mot. to Intervene at 4-5. The Court has found, however, that such representation is impossible due to Intervenors' nonexhaustion. Consequently, granting the Motion to Intervene would be a futile exercise, and must be denied.

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n12 The Court declines to wade into the middle of the parties' mudslinging over whether Intervenors' motion was filed too long after the inception of this suit. Defendants deplore the length of time between this Court's decision filed on May 11, 1999, finding that Mr. Kifafi was not an adequate class representative for the service counting class, and Intervenors' original and renewed intervention motions which were filed on January 22, 2003, and July 21, 2003. See Defs.' Opp. at 40-41. Intervenors claim that any delay was the result of Defendants' sluggardly discovery responses. See Mot. to Intervene at 8-9; Reply at 13. The Court's finding that the purpose of intervention cannot be achieved spares the Court consideration of these finger-pointing "arguments."

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**[\*24]**

## III. CONCLUSION

After reviewing the Motion to Intervene, the Court determines that the motion must be denied because Intervenors have failed to exhaust Hilton's available internal administrative procedures for their claims. Intervenors' failure to exhaust cannot be excused either because of futility or because of any exhaustion on Mr. Kifafi's part. As a result, the Court finds that the purpose behind the Motion to Intervene, specifically that Intervenors may serve as class representatives for the putative service counting class, would not be achieved, and permitting the three individuals to intervene would be inappropriate at this time.

An appropriate Order accompanies this Memorandum Opinion.

COLLEEN KOLLAR-KOTELLY

United States District Judge

## ORDER

In accordance with the accompanying Memorandum Opinion, it is this 27th day of September, 2004, hereby

ORDERED that the Motion to Intervene as Named Representatives in Support of Vesting Service Claims [147] is DENIED.

COLLEEN KOLLAR-KOTELLY

United States District Judge

Service: **Get by LEXSEE®**
Citation: **2004 US Dist Lexis 28928**
View: Full
Date/Time: Monday, April 2, 2007 - 3:54 PM EDT

* Signal Legend:
● - Warning: Negative treatment is indicated
Ⓠ - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
Ⓘ - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

 LexisNexis® | About LexisNexis | Terms & Conditions | Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT CRAIG SHIRLEY, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 06-C-3414 |
| | ) | |
| PAUL BALSAMELLO, | ) | Judge Ronald A. Guzman |
| | ) | Magistrate Judge Cole |
| Respondent. | ) | |

## PETITIONER'S MOTION FOR RECONSIDERATION
## OF THE COURT'S APRIL 26, 2007 ORDER AND JUDGMENT

Petitioner, Robert Craig Shirley ("Shirley"), pursuant to Rule 59 of the Federal Rules of Civil Procedure, respectfully asks this Court to reconsider its Order and Judgment dated April 26, 2007 (the "Order"). The Order dismissed Shirley's Amended Application to Confirm Arbitration Award ("Amended Application") pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure on the ground that the Court lacks subject matter jurisdiction over said application. For the reasons set out below, Shirley maintains that the "amount in controversy" requirement has been met, and that this Court does have subject-matter jurisdiction over this matter on the basis of diversity. 28 U.S.C. § 1332.

### Introduction

Shirley is mindful that this Court wrote only recently, in Bell v. Leavitt, No. 06-C-3520, 2007 WL 551553 (N.D. Ill. Feb. 16, 2007), that:

> this Court's orders are not "first drafts, subject to revision and reconsideration at a litigant's pleasure." See Quaker Alloy Casting Co. v. Gulfco Indus., Inc., 123 F.R.D. 282, 288 (N.D. Ill. 1985). Thus, motions to reconsider are rarely appropriate. Id. In the context of final judgments, our court of appeals has said that motions to reconsider should be presented only when the law or facts change significantly after the issue is presented to the Court, the Court has "patently misunderstood a party," has "made a decision outside the adversarial issues

presented" to it, or has "made an error not of reasoning but of apprehension." Bank of Waunakee v. Rochester Cheese Sales, 906 F.2d 1185, 1191 (7th Cir. 1990) (quotation omitted). Such motions do not allow "a party to undo its own procedural failures, [or] ... introduce new evidence or advance arguments that could and should have been presented to the district court prior to the judgment." Moro v. Shell Oil Co., 91 F.3d 872, 876 (7th Cir. 1996).

Shirley respectfully submits that this is one of the rare instances in which reconsideration is appropriate, particularly as the parties did not fully brief the issue of subject-matter jurisdiction, or discuss many of the cases cited below. See RFC/CLC, LLC v. Siemens Information and Communications Network, Inc., No. 00-C-0180, 2003 WL 22287362 (N.D. Ill. Sept. 30, 2003) (granting motion for reconsideration based upon review of additional case law).

**Discussion**

In his Amended Application, Shirley stated as follows:

> ***This is a controversy between citizens of different states, and it involves a sum in excess of $75,000, exclusive of interest and costs.*** As a result, this Court's ***diversity jurisdiction*** is properly invoked under ***28 U.S.C. § 1332***.... (Emphasis added).

(Amended Application, § 4.)  Significantly, at the conclusion of the Amended Application, Shirley asked, "WHEREFORE, based upon the foregoing, Robert Craig Shirley respectfully requests the issuance of an Order confirming the panel's Award in NASD Dispute Resolution Arbitration No. 04-03536." (Amended Application, at page 4.)  Shirley did not ask merely for the Court to Order expungement – he asked for "an Order confirming the panel's Award...." It was thus an error for this Court to find that "the monetary award is not at issue here. The only aspect of the award that is at issue is the arbitrators' 'recommend[ation]' that Balsamello's complaint be expunged from Shirley's NASD records." (Order, at 2.)  A confirmed Award, for example, has preclusive effects that an unconfirmed Award may not have. See, e.g. In re Drexel Burnham Lambert Group, Inc., 161 B.R. 902 (S.D. N.Y. 1993).

This Court recognized that in the underlying NASD arbitration, "Balsamello claimed that Shirley recommended unsuitable investments to him and churned his account, and RBC failed to supervise Shirley appropriately, causing Balsamello to lose more than $400,000.00."  (Order, at 2.)  Likewise, the Court realized that the arbitrators, among other things, "(2) ordered 'RBC . . . [to] pay to Paul Balsamello the sum of $226,794.00 . . . as compensatory damages'; and (3) 'recommend[ed] the expungement of all reference to this claim from . . . Shirley's registration records maintained by the NASD Central Registration Depository.'"  <u>Id</u>.  Nevertheless, the Court held that "Shirley has not established that the amount-in-controversy element of diversity jurisdiction is met."  <u>Id</u>.  Shirley respectfully submits that the Court is incorrect: for purposes of the "amount in controversy" element of diversity jurisdiction, the pertinent fact for the Court to consider is the amount claimed in the underlying arbitration.

**A.    The "Amount in Controversy" in a Proceeding to Confirm an <u>Arbitration Award is the Amount of the Underlying Arbitration Claim.</u>**

Here, as recited in the Award and acknowledged by the Court, Paul Balsamello brought a claim against Shirley (and RBC Dain) seeking $443,070.00, plus punitive damages in the amount of $100,000.00.  (Award, at page 2.)  The Award states that RBC Dain "is liable for and shall pay to Paul Balsamello the sum of $226,794.00 ... as compensatory damages."  <u>Id</u>.  Plainly, both of these numbers satisfy the requirement that the amount in controversy exceed $75,000.  28 U.S.C. § 1332.

The misapprehension which the Court seems to have made is that it considered only the expungement relief sought, when Shirley's Application was, in fact broader than that.  Shirley sought confirmation of the Award against Paul Balsamello, the Claimant in the underlying arbitration.  It is true, as the Court wrote, that RBC Dain "is not a party to this proceeding and Balsamello declined to appear in it."  (Order, at 2.)  However, Balsamello was seeking damages

- 3 -

from both RBC Dain and Shirley, jointly and severally. The fact that the Panel did not order

Shirley to pay any money to Balsamello does not change the fact that Balsamello was seeking

"an award in the amount of $443,070.00" against *both* RBC Dain and Shirley. It does not matter

for purposes of considering subject-matter jurisdiction whether a party (like Balsamello) declines

to appear in the case. Plainly, a party cannot defeat federal subject matter jurisdiction simply by

failing to appear.

In <u>Theis Research, Inc. v. Brown & Bain</u>, 400 F.3d 659 (9th Cir. 2005), the court

examined an arbitration award for "zero" dollars, which was the product of a claim for over $200

million. The court concluded that "the amount at stake in the underlying litigation, not the

amount of the arbitration award, is the amount in controversy for purposes of diversity

jurisdiction...." <u>Id</u>. at 662. Likewise, in <u>Bull HN Information Systems, Inc. v. Hutson</u>, 229 F.3d

321, 328-29 (1st Cir. 2000), the First Circuit Court of Appeals found the $75,000 amount in

controversy element "plainly met," even though the plaintiff sought to vacate an award for only

$52,605.57 (plus interest), because the "the total amount at issue in the entire arbitration

exceeded $75,000." <u>See also</u> <u>Doctor's Associates, Inc. v. Stuart</u>, 11 F. Supp. 2d 221, 224 (D.

Conn. 1998) ("the amount in controversy is the difference between winning and losing the

underlying arbitration."); Christopher L. Frost, *Welcome to the Jungle: Rethinking the Amount in*

*Controversy in a Petition to Vacate an Arbitration Award Under the Federal Arbitration Act*, 33

PEPP. L. REV. 227, 263 (2005) (surveying different approaches to the "amount in controversy"

and concluding that the "arbitration demand" approach "best balances efficiency and fairness.").

The fact that Shirley is asking this Court only to *confirm* the Award (as opposed to

*vacating* it) is of no legal significance. <u>See</u> <u>Loral Corp. v. Swiftships, Inc.</u>, 77 F.3d 420 (11th Cir.

1996) (finding federal court jurisdiction over a petition to confirm an arbitration award even in

the absence of a countervailing petition to vacate); <u>Doctor's Associates, Inc. v. Puskaritz</u>, No. 3:05CV1834, 2006 WL 1102762 (D. Conn. April 26, 2006) (finding subject matter jurisdiction over a "zero" award that a party sought to have confirmed when the other party brought a motion to vacate in a separate federal jurisdiction).

In sum, the weight of persuasive authority holds that the amount in controversy in a federal court case seeking confirmation (or vacation) of an arbitration award is the amount sought in the underlying arbitration.  It was a "patent misunderstanding" of Shirley's position that apparently led the Court to issue its Order, declaring the amount in controversy had not been met. From the face of the Award (attached to Shirley's Amended Application as an exhibit), it is plain that an Award for over $200,000, issued in connection with a claim for over $400,000, has put more than $75,000 "in controversy."

### B.    Shirley's Request for Expungement of His Form U4 Also Gives This Court Federal Question Jurisdiction.

Shirley did not refer to "federal question jurisdiction," 28 U.S.C. § 1331, in either his Application to Confirm or his Response to ISD's Motion to Dismiss.  However, since the Court itself raised the issue *sua sponte* in its Order, Shirley discusses below why, in fact, federal question jurisdiction under 28 U.S.C. § 1331 may be appropriate as well.

It is well-established that federal courts do not have federal question jurisdiction to confirm or vacate arbitration awards simply because such awards may involve questions relating to securities law, and that there is a necessity for an independant ground of federal jurisdiction when a claim is brought under the FAA.  <u>See</u> <u>Minor v. Prudential Securities, Inc.</u>, 94 F.3d 1103, 1104-05 (7th Cir. 1996).  <u>See also</u> <u>Ford v. Hamilton Investments, Inc.</u>, 29 F.3d 255, 257-58 (6th Cir. 1994); <u>Perpetual Securities, Inc. v. Tang</u>, 290 F.3d 132, 140 (2d Cir. 2002) (collecting cases). However, "federal question" subject-matter jurisdiction in this matter nevertheless exists since

part of the relief which Shirley seeks is "expungement" from his Form U4.  As the NASD has written, "[t]he CRD system is an online registration and licensing system for the U.S. securities industry, state and federal regulators, and self-regulatory organizations (SROs).  The CRD system contains ... information on associated persons filed on Forms U4 and U5."  NASD Notice to Members 04-16 (March 2004), at page 212.  (Attached to this Motion as Exhibit A is a copy of NASD Notice to Members 04-16.)  The pertinent rule on expungement of customer dispute information from the Central Registration Depository ("CRD") was approved by the United States Securities and Exchange Commission ("S.E.C.") on December 16, 2003.  <u>Id</u>. at 211.  <u>See</u> 68 Fed. Reg. 74667 (Dec. 24, 2003) Exchange Act Release No. 48933 (File No. SR-NASD-2000-168 (Dec. 16, 2003), 68 Fed. Reg. 74667 (Dec. 24, 2003).  Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, gives federal district courts "exclusive jurisdiction of violations of [the Act] or the rules and regulations thereunder, and of all suits ... brought to enforce any liability or duty created by [the Act] or the rules and regulations thereunder."

Although, again, it is well-settled that the mere existence of disputes related to federal securities law do not give this Court "federal question" subject-matter jurisdiction, Shirley is aware of no cases which hold that an expungement Order in particular is outside the scope of the Securities Exchange Act of 1934.  In fact, firms are required to amend a representative's Form U4 when a "sales practice" related claim is made against a representative, and such claims necessarily involve alleged violations of the federal securities laws.  Indeed, the Court recognized in its Order that "federal claims were raised in the arbitratrion."  (Order, at 2.)

The Court held that "Shirley's confirmation request does not implicate any federal law. His request depends solely on the language of the award."  (Order, at 2.)  Shirley respectfully disagrees.  His request for expungement is not based on "the equivalent of a contract claim," as

the Court's Order suggests.  Instead, Shirley's request for an expungement implicates the S.E.C.'s "rules and regulations," 15 U.S.C. § 78aa, over which the federal district courts have exclusive jurisdiction.  The nationwide CRD system, the rules of which are governed by the S.E.C., necessarily implicates federal law.

<u>Conclusion</u>

For the reasons stated herein, Shirley respectfully requests that the Court reconsider its April 26, 2007 Order and Judgment, determine that it does have subject-matter jurisdiction over this matter, and confirm the entire Award in NASD Dispute Resolution Arbitration No. 04-03536.

Respectfully submitted,

ROBERT CRAIG SHIRLEY


By:  _____/S_____
            One of his Attorneys
        Ronald P. Kane (Ill Bar No. 1392611)
        Thomas A. Volz (Ill Bar No. 6238296)
        KANE & FISCHER, LTD.
        208 S. LaSalle Street, Suite 1800
        Chicago, Illinois  60604
        312/422-7200
        312/422-7217 [Fax]

<u>Of Counsel</u>
Gordon D. Gee
SEIGFRIED, BINGHAM, LEVY, SELZER & GEE, P.C.
2800 Commerce Tower
911 Main Street
Kansas City, Missouri  64105
816/421-4460
816/474-3447 [Fax]